**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Humberto LECHUGA, Defendant–
Appellant.**

**No. 91–2891.**

United States Court of Appeals,
Seventh Circuit.

Argued April 1, 1992.

Reargued En Banc Dec. 15, 1992.

Decided May 13, 1993.

See also 769 F.Supp. 1056.

Eric J. Klumb, R. Jeffrey Wagner, argued, Asst. U.S. Attys., Milwaukee, WI, for plaintiff-appellee.

James M. Shellow, argued, Robert R. Henak, Dean A. Strang, Shellow, Shellow & Glynn, Milwaukee, WI, for defendant-appellant.

Before BAUER, Chief Judge, and CUMMINGS, CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, KANNE, and ROVNER, Circuit Judges.

POSNER, Circuit Judge.

An indictment charged Humberto Lechuga with having in his possession more than 500 grams of cocaine, with the intention of distributing the cocaine; and also with having conspired with Evelio Pinto and unnamed others to distribute the cocaine. 21 U.S.C. §§ 841(a)(1), 846. The jury convicted Lechuga on both counts, and the judge sentenced him to 75 months in prison.

A government undercover agent named Carr had arranged to buy 500 grams of cocaine from Pinto. To obtain the cocaine for the sale, Pinto got in touch with Sam Pagan, who had previously sold Pinto cocaine that Pagan had obtained from Lechuga. Pagan relayed Pinto's order to Lechuga, who designated an apartment building where Pagan was to receive the cocaine from Lechuga

for transfer to Pinto and to pay Lechuga for it, presumably with money that Pagan would collect from Pinto at the time of the transfer. Accompanied by Pinto and Carr, Pagan went to the building designated by Lechuga and emerged carrying two packages. One contained the 500 grams (1.1 lbs.) that Pinto had ordered. The other contained 3 ounces. The reason for the second package was that on a previous three-cornered deal involving Lechuga, Pagan, and Pinto, Lechuga had delivered 3 ounces less than Pinto had ordered and paid for. So now Lechuga was making up for the short delivery. As soon as Pagan handed over the packages of cocaine to Pinto, the two were arrested. Lechuga was arrested later.

■ Lechuga's main argument—the argument that caused us to decide to hear this case en banc under Circuit Rule 40(f) (rehearing before issuance of the panel's decision)—is that the mere fact that he sold Pinto a quantity of cocaine too large for Pinto's personal use, and therefore must have known that Pinto was planning to resell it, is insufficient to prove a conspiracy between Pinto and him. Before today, it was widely assumed that a conviction for participation in a drug conspiracy could be affirmed with no more evidence than that the defendant had sold in a quantity too large to be intended for his buyer's personal consumption, e.g., *United States v. Mancari*, 875 F.2d 103, 105 (7th Cir.1989); *United States v. Roth*, 777 F.2d 1200, 1205 (7th Cir.1985), though some of our cases, notably *United States v. Baker*, 905 F.2d 1100, 1105–06 (7th Cir.1990), and *United States v. Lamon*, 930 F.2d 1183, 1191 n. 18 (7th Cir.1991), tugged the other way. Today we resolve the conflict in our cases by holding that "large quantities of controlled substances, without more, cannot sustain a conspiracy conviction." *Id.* What is necessary and sufficient is proof of an agreement to commit a crime other than the crime that consists of the sale itself.

To understand the problems created by an allegation of a conspiracy between a seller on the one hand and a buyer for resale on the other, we must take a step back and ask why uncompleted conspiracies are punished, even though the conspiracy here was completed—

the cocaine was delivered to Pinto before he was arrested. It is not a good answer to say that they are punished on the same theory as attempts are punished; for given a law of attempts we must ask why uncompleted conspiracies are also punished. The full answer may include historical accident but there is also a functional reason. Because crimes are difficult to deter by mere threat of punishment, society tries to prevent them and one way to do this is by identifying and incapacitating people who are likely to commit crimes. The risk to civil liberties that would be created by a purely preventive theory of criminal punishment is so great, however, that society insists on definite proof of dangerousness. An attempt is one form of satisfactory proof. A person who goes so far in the preparation of a criminal act as to be guilty of an attempt has given definite proof that he is likely to commit such an act. And likewise a person who agrees to commit a crime, even if he takes no additional preparatory steps and as a result does not come close enough to committing the crime to be guilty of an attempt.

All this makes good sense when we are speaking of the punishment of uncompleted conspiracies, but what of the punishment of a completed one? Lechuga delivered cocaine in violation of federal criminal law; why should he also be punished for agreeing to deliver it? The stock answer is that a conspiracy has more potential for doing harm than a single individual does. *Callanan v. United States*, 364 U.S. 587, 593–94, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961). It is not a bad answer, as the facts of this case indicate. Lechuga might have been frightened to deal face to face with Pinto, whom he had shortchanged, as it were, on their previous transaction; or he might have been wary about delivering the cocaine to Pinto and Pinto's customer in person, since then he would be outnumbered two to one and honor among thieves is more an aspiration than a presumption.

This is the point at which sale for resale rather than for consumption becomes relevant. Contrast two modes of distribution. In one, a bulk dealer like Lechuga sells his inventory directly to the ultimate consumer.

So if he has a kilogram of cocaine to sell he breaks it up into numerous small packages (for example, into 500 2–gram packages) and hawks it on street corners. The process of breaking bulk and selling at retail is time-consuming. That will limit the scale of our hypothetical Lechuga's operations. If all drug dealers were constrained to sell at retail the drug trade would be smaller than it is, just as the legitimate drug trade would be smaller than it is if manufacturers of legitimate drugs were forbidden to sell through pharmacists or other retailers and therefore had to sell directly to the consuming public if at all.

This is an argument for treating any sale of drugs for resale as a conspiracy. It is only a short step to the conclusion that any sale of drugs in a quantity greater than appropriate for individual consumption is presumptively a sale for resale, though the presumption could be rebutted, for example by evidence that the bulk purchaser was planning to throw a huge party at which he would serve his guests cocaine. Many of the objections to this approach are superficial, for example that the federal statute forbidding the sale of, and possession with intent to sell, drugs already imposes heavier penalties the larger the quantity sold or possessed. 21 U.S.C. § 841(b). The quantity goes to the severity of the sentence, not the existence of the crime. *United States v. McNeese*, 901 F.2d 585, 600–01 (7th Cir.1990). The issue of inferring the crime of conspiracy from the sale of or the agreement to sell a quantity so large that it is almost certainly intended for resale by the buyer rather than for his personal consumption is distinct. Nor is it an objection that to deem the seller (Lechuga) and the buyer (Pinto) members of a conspiracy to distribute drugs would imply that someone who rented Pinto the premises from which he conducted his business of reselling drugs to the ultimate consumers would be a conspirator with Pinto in the sale of drugs, though even if the landlord knew the purpose to which his tenant was putting the premises he would be at most an aider and abettor of Pinto's illegal business. *United States v. Giovannetti*, 919 F.2d 1223, 1227 (7th Cir. 1990). Someone who provides an input into another's business usually cares only about selling the input, not about furthering the other's business. It is different when the buyer is the seller's distributor, without whom the seller cannot reach the market for his product.

Yet there is still a serious objection to concluding that a sale for resale leagues the seller and the buyer in a conspiracy (which can be inferred from the quantity involved in the sale—but that is not the problem). The objection is that while dangerousness may be the justification for punishing conspiracies separately from attempts and completed crimes, proof of dangerousness cannot be substituted for proof of conspiracy. The conspiracy itself must be proved.

We must therefore ask what a conspiracy is. A criminal conspiracy, the cases say, is an agreement to commit a crime. E.g., *Iannelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975); *United States v. Blankenship*, 970 F.2d 283, 285 (7th Cir.1992). The definition is incomplete, as we shall see. Nevertheless it is a beginning, for there cannot be conspiracy without agreement. What is an "agreement"? The term is like "contract" but is at once broader and narrower. It is broader because it embraces agreements that might for one reason or another, including illegality, not be legally enforceable. It is true that we sometimes speak of an "unenforceable contract" without a sense of semantic strain. But, at least to lawyers, the term "contract" ordinarily signifies an agreement that might in principle be enforced in a court of law, or in some substitute tribunal, such as a panel of arbitrators, agreed to by the parties in advance. Yet some legally enforceable contracts do not involve a "real" agreement in the sense of a meeting of the minds but are enforced because the parties uttered words or engaged in acts that the law deems sufficient to create a legally enforceable contract. In this respect the term "agreement" is narrower than the term "contract."

█ This shows that to know what a "contract" is you must be a lawyer; but "agreement" is a lay term, and while it may be difficult to define, it usually is easy to identify. There was an agreement between Le-

chuga and Pinto—an agreement on Lechuga's part to sell, and on Pinto's to buy, a specified amount of a specified product at a specified time and place and for a specified price. Was there therefore a conspiracy? Our cases hold, as do many in other circuits, that there would not be a conspiracy if Pinto were buying for his own consumption. *United States v. Kimmons,* 917 F.2d 1011, 1016–17 (7th Cir.1990); *United States v. Mancari, supra,* 875 F.2d at 105; *United States v. Douglas,* 818 F.2d 1317, 1321 (7th Cir.1987); *United States v. Moran,* 984 F.2d 1299, 1302 (1st Cir.1993). Evidently, while proof of an agreement is necessary for a finding of conspiracy, it is not sufficient.

The rationale for the own-consumption exception is that when a crime requires the joint action of two people to commit (prostitution, adultery, incest, bigamy, and duelling are other examples), a charge of conspiracy involves no additional element unless someone else is involved besides the two persons whose agreement is the sine qua non of the substantive crime. The rationale could be questioned, on the ground that it is at most a reason for requiring that the sentences for the conspiracy and the completed crime run concurrently (though even this is unnecessary if the legislature intends cumulative punishment, *Missouri v. Hunter,* 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983)), or perhaps that the punishment for the conspiracy be capped at the punishment for the completed crime on the theory that the punishment prescribed for the specific offense is the best evidence of what the legislature thought a proper sanction for the defendant's conduct. Considerations such as these have persuaded the Supreme Court to demote the rule that forbids punishing as conspirators the minimum number of offenders necessary for a joint-action crime from a strict rule ("Wharton's Rule") to a principle of statutory interpretation. *Iannelli v. United States, supra,* 420 U.S. at 785–86, 95 S.Ct. at 1293–94.

■ There is another way to understand the own-consumption exception, however—a way that shows that, at least in some of its manifestations, as in this case, it is not an exception at all, but an instantiation of the rule that makes conspiracies criminal. A conspiracy is not merely an agreement. It is an agreement with a particular kind of object—an agreement to commit a crime. When the sale of some commodity, such as illegal drugs, is the substantive crime, the sale agreement itself cannot be the conspiracy, for it has no separate criminal object. What is required for conspiracy in such a case is an agreement to commit some other crime beyond the crime constituted by the agreement itself. We shall see that there *was* such an agreement here (as there had been in *Iannelli* )—the agreement between Lechuga and Pagan to cooperate in the sale of drugs to Pinto. The object of the agreement was to commit the crime of selling drugs to Pinto. But insofar as there was an agreement between Lechuga and Pinto merely on the one side to sell and on the other to buy, there was no conspiracy between them no matter what Pinto intended to do with the drugs after he bought them. Lechuga would not, merely by selling to Pinto, have been agreeing with Pinto to some further sale. A person who sells a gun knowing that the buyer intends to murder someone may or may not be an aider or abettor of the murder, but he is not a conspirator, because he and his buyer do not have an agreement to murder anyone.

There might have been a separate agreement between Lechuga and Pinto. Suppose Lechuga had told Pinto that he needed a good distributor on the south side of Chicago and wanted to enter into a long-term relationship with Pinto to that end. Then it would be as if Lechuga had hired Pinto to assist him in reaching his market. It should not make a difference whether an illegal agreement takes the form of an illegal simulacrum of an employment contract or of a "relational" contract, implying something more than a series of spot dealings at arm's length between dealers who have no interest in the success of each other's enterprise. Vertical integration is not a condition of conspiracy. And of course the initiative might in our hypothetical case have come from Pinto rather than from Lechuga without affecting the analysis. Even the number of sales, a factor stressed in some cases, would be significant only insofar as it cast light on

the existence of a continuing relation, implying an agreement with an objective beyond a simple purchase and sale and thus an agreement separate from the sale itself—the latter being an agreement, all right, but not a conspiracy. *United States v. Baker, supra,* 905 F.2d at 1106. What made "prolonged cooperation" a factor in inferring conspiracy in *Direct Sales Co. v. United States,* 319 U.S. 703, 713, 63 S.Ct. 1265, 1270, 87 L.Ed. 1674 (1943), was that it showed that the defendant not only knew that it was selling drugs to someone for use in an illicit enterprise but had "join[ed] both mind and hand with him to make its accomplishment possible." See also *id.* at 712 n. 8, 63 S.Ct. at 1269 n. 8. Prolonged cooperation is neither the meaning of conspiracy nor an essential element, but it is one type of evidence of an agreement that goes beyond what is implicit in any consensual undertaking, such as a spot sale.

A more difficult case, as noted in *United States v. Moran, supra,* 984 F.2d at 1302, 1304, would be that of an agreement between A and B for A to make a spot sale of drugs to B in the future—an agreement with a separate criminal object, that of making an illegal sale, but an agreement that seems only adventitiously distinct from the sale itself. No agreement of any kind between Lechuga and Pinto separate from the sale of cocaine to Pinto was proved, however, so Lechuga's conviction for conspiracy cannot be affirmed on the basis of the agreement with Pinto.

It does not follow that the conviction must be reversed. The indictment charged a conspiracy with others besides just Pinto, and the evidence showed that Lechuga had in fact conspired with Pagan; therefore the conviction of conspiracy must be upheld after all. A finding that Lechuga had conspired with Pagan was within the scope of an indictment worded as this one was, and the fact that the indictment did not name Pagan is irrelevant. *United States v. Rey,* 923 F.2d 1217, 1222 (6th Cir.1991). It is true that the focus of both the trial and the appeal was on the alleged conspiracy between Lechuga and Pinto. But the government's brief does not describe the conspiracy as being limited to Lechuga and Pinto. It says that "the evidence clearly established that Lechuga was supplying resale quantities of cocaine to Pagan and others as part of his ongoing agreement with Pagan. As such, sufficient evidence existed to support Lechuga's conspiracy conviction." Lechuga's reply brief takes issue with the conclusion that there was sufficient evidence of such a conspiracy, but does not quarrel with the characterization of the conspiracy as one that included Pagan. And at the en banc argument Lechuga's lawyer acknowledged that it would be proper to affirm his client's conviction on the basis of such a conspiracy were it factually supported, which he denied.

The critical issue is whether, on the one hand, the relationship between Lechuga and Pagan is properly characterized as that of a spot seller and a spot buyer; or, on the other hand, whether the sale was from Lechuga to Pinto with Pagan functioning as a go-between, facilitator, sales agent, and general helper. If, knowing that Lechuga was a drug dealer, Pagan assisted him in distributing drugs to at least one dealer farther down the chain of distribution, namely Pinto, then Lechuga and Pagan were coconspirators. *United States v. Aguilar,* 948 F.2d 392, 396 (7th Cir.1991); *United States v. Boyer,* 931 F.2d 1201 (7th Cir.1991); *United States v. Townsend,* 924 F.2d 1385, 1400–01 (7th Cir. 1991); *United States v. Rivera,* 855 F.2d 420 (7th Cir.1988). If Lechuga and Pagan had the same simple seller-buyer relationship as Lechuga and Pinto, then, for the reasons explained earlier, there was no conspiracy between them.

■ We must take a closer look at the facts concerning their relationship. Pagan was asked on direct examination what his purpose had been in seeking to meet Lechuga. He answered that it had been to "get in some kind of [drug] deals." He was then asked, "What did you want to do with drugs with [Lechuga]?" Answer: "Just sell it." It is apparent that he wanted to sell drugs on Lechuga's behalf, for when the two had first met he had told Lechuga, "I know these [*sic* ] this guy, he's looking for some amount [of drugs], and he [Lechuga] had it." In other words, Pagan had a customer (although his testimony is not entirely clear on this point, apparently it was Pinto) for a particular

amount of drugs, and he wanted Lechuga to supply him with the necessary amount. This is hardly consistent with Lechuga's being a spot seller unaware of what activities Pagan, or any subsequent occupier of a place in the chain of distribution, might undertake. Lechuga knew precisely what Pagan was going to do with the drugs he sold him. Pagan *told* Lechuga what he was going to do with them.

This was in February 1988. In May, Pinto told Pagan that he had a friend who wanted cocaine, so Pagan "called [Lechuga]," and told him the amount he needed. The inference is inescapable that Pagan told Lechuga that Pinto would require an extra three ounces to make up for a previous short delivery by Lechuga and Pagan. For Pagan testified that the reason Pinto was to get an extra three ounces was that "We had another deal with him [Pinto] and he claimed that we were short, so I request from [Lechuga] again the three ounces." The "we" is obviously Lechuga and Pagan. A rational jury could infer from the testimony we have summarized that Lechuga and Pagan were dealing jointly with Pinto, with Pagan's role that of a sales agent. Therefore the jury's finding of conspiracy is adequately supported by the evidence.

Lechuga challenges his conviction on a number of other grounds, but they have no merit and require little discussion. Most were waived in the district court, and therefore can be raised in this court only if they demonstrate plain error, Fed.R.Crim.P. 52(b), which is to say an error that must be corrected in order to avert a miscarriage of justice. *United States v. Caputo*, 978 F.2d 972, 974 (7th Cir.1992). The challenges to the wording of the indictment and to the instructions are frivolous. Lechuga presents slightly more substantial *Brady* and *Miranda* issues. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). As to the first, he argues that the government should have been required to disclose to him that it had "threatened" its star witness, Pagan, with prosecution for his own part in the conspiracy if he did not cooperate by testifying against Lechuga. But the only "threats"

consisted of occasional reminders to Pagan of something that was obvious—that, having participated in the conspiracy, he could be prosecuted. He testified that he had not been prosecuted, and the jury was left to draw the obvious inference—that his fate depended on his effectiveness as a witness against Lechuga. Disclosure of the so-called "threats" would have added nothing.

Lechuga's principal defense at trial was that Pagan had confused him with Lechuga's brother Raul. But Lechuga had told the police when he was arrested that his brother had been in Mexico for the past six months. This admission was used at trial to knock down his defense of mistaken identification. He argues that the admission was extracted from him without his having first received the *Miranda* warnings. He did not make the argument at trial, and it is barred on appeal because, although this is a close case on the question whether Lechuga was involved in a conspiracy, it is not a close case on whether Pagan was dealing with him rather than his brother. On that issue the evidence against Lechuga was overwhelming, so that exclusion of the admission could not have made a difference.

AFFIRMED.

COFFEY, Circuit Judge, with whom MANION, Circuit Judge joins, concurring in the judgment.

I agree with the majority that we must affirm Humberto Lechuga's conviction. I write separately to make two points.

First, as the majority agrees, whether the sale of a distribution-size quantity of cocaine is sufficient to establish a conspiracy between a buyer (here, Pinto) and seller (here, Lechuga) to distribute cocaine is not a question presented by the facts of this case. Granted, because the defense attorney cleverly focused on that question in the appeal, and cast aside the central conspiracy charge made in the indictment, we decided to rehear the case *en banc* to consider that issue. However, it became clear to several of the judges during the *en banc* oral argument that the Government presented far more evidence in support of Lechuga's conspiracy conviction than a single sale to Pinto of a distribution-amount

of cocaine. Nevertheless, the plurality, taking the defense counsel's bait, spends the bulk of its opinion addressing the single-sale question, in effect issuing an *en banc* advisory opinion. I believe the court should address only the issues necessary for resolution of this case and leave the single-sale question for the day when it is clearly presented by the facts of a particular case. In taking this view, I am in harmony with the position recently urged by Judge Posner in his dissent in part in *Reed v. Gardner*, 986 F.2d 1122, 1129 (7th Cir.1993), where he wisely counseled that "[w]e should not pronounce on legal questions ... in a case in which our answers cannot alter the outcome." *See also United States v. Fischer*, 833 F.2d 647, 649 (7th Cir.1987). Addressing issues not required for resolution of a case runs the danger that the "opinion might be ill-informed and unreliable because the factual record on which it was based was incomplete or hypothetical." *People of the State of Illinois v. Archer Daniels Midland*, 704 F.2d 935, 942 (7th Cir.1983). My view is that unless it is necessary to decide a question, it is necessary not to decide a question. Instead of deciding an issue not before us in dicta, we should decide the case on its merits.

My second reason for writing separately is to spread upon the appellate decision record some facts in addition to the plurality's brief analysis of the evidence we rely upon to affirm Lechuga's conviction. The indictment did not specifically name Samuel Pagan as a coconspirator but instead charged that "Evelio Pinto and Humberto Lechuga ... conspire[d] between themselves and with persons known and unknown to the grand jury to distribute and possess with the intent to distribute" cocaine. However, "persons known and unknown to the grand jury" could certainly include Pagan. We have made clear that it

> "is the grand jury's statement of the existence of the conspiracy agreement rather than the identity of those who agree which places the defendant on notice of the charge he must be prepared to meet.... Thus, the government is permitted to allege in an indictment, as it did in this case, that, in addition to the defendants named in a conspiracy count, the defendants conspired with others known and unknown to the grand jury."

*United States v. Townsend*, 924 F.2d 1385, 1389–90 (7th Cir.1991) (citations and internal punctuation omitted). *See also United States v. Kramer*, 711 F.2d 789, 796 (7th Cir.), *cert. denied*, 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983) ("There is ... no requirement that a conspiracy indictment identify uncharged coconspirators.") Thus, the Government was free to try the case (as it did) as a Lechuga–Pagan–Pinto conspiracy[1], even though Pagan was not referred to specifically in the indictment.[2]

In reviewing jury convictions we are required to consider *"whether, after viewing the evidence in the light most favorable to the government, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"* *United States v. Lamon*, 930 F.2d 1183, 1190 (7th Cir.1991) (citations omitted) (emphasis added). *"We may overturn a verdict only when the record is devoid of any evidence,*

---

1. In his closing argument to the jury, the prosecutor stated that the evidence clearly established an agreement between Pinto, Pagan, and the defendant Humberto Lechuga to distribute cocaine. He also told the jury that numerous witnesses testified that on May 11 Humberto Lechuga was "involved in the distribution of cocaine with Sam Pagan". At oral argument before this court, the Government attorney stated that the "hub of the conspiracy" was the agreement between Humberto Lechuga and Pagan. Thus, at trial the government did not rely exclusively on the theory that Lechuga joined an existing conspiracy between Pagan and Pinto.

2. Defense counsel argued at the trial level that Lechuga could not be convicted of conspiring with Pagan because Pagan was not named in the indictment. In its memorandum supporting its motion for judgment of acquittal or a new trial, defense counsel argued that "it is not enough that Lechuga and Pagan may themselves have had a conspiratorial agreement between [the] two [of them], for the grand jury alleged that Pinto—Pagan is nowhere named—and Lechuga, with others, formed a criminal association." As I have already made clear, and as defense counsel is well aware, this is an incorrect statement of the law; the jury was free to convict Humberto Lechuga of conspiracy if it determined that he had conspired with Samuel Pagan to distribute the cocaine.

regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir.1990) (emphasis added). "The evidence need not be inconsistent with every reasonable hypothesis of innocence in order to sustain the conviction ..., and we will not reweigh the evidence or judge the credibility of witnesses." *United States v. Maholias*, 985 F.2d 869, 874 (7th Cir.1993) (citations omitted).

A conspiracy is a combination or confederation between two or more persons formed for the purpose of committing a criminal act through their joint efforts. *Lamon*, 930 F.2d at 1190. The government must prove that the defendant knew of the conspiracy and intended to associate himself with it. *Id.* In evaluating a conspiracy conviction, we need not limit our inquiry to the direct evidence of the defendant's connection to the conspiracy:

> "Conspiracies, like other crimes, may be proved entirely by circumstantial evidence. *United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir.1990). *If the prosecution presents enough circumstantial evidence to support, beyond a reasonable doubt, an* inference *that the defendants agreed among themselves to distribute drugs, a jury would justified in convicting those defendants of conspiring together.* The critical question, then, is whether the jury may reasonably *infer* a single agreement among the defendants from the evidence of the drug transactions presented by the government."

*Townsend*, 924 F.2d at 1390 (emphasis added). Moreover, the "nature of a conspiracy is such that its existence and the involvement of the co-conspirators in it must often be proved by circumstantial evidence." *United States v. Sullivan*, 903 F.2d 1093, 1098 (7th Cir.1990) (citation omitted). "The government need not establish that there existed a formal agreement to conspire; circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct may serve as proof." *Id.* This is especially true in drug conspiracies where the "clandestine" nature of the nefarious scheme makes it "ridiculous to presume that

the government could obtain witnesses with firsthand knowledge of the group's activities." *United States v. Vega*, 860 F.2d 779, 793 (7th Cir.1988) (citation omitted). We will affirm a conspiracy conviction if the government has presented substantial evidence connecting the defendant to the conspiracy. *Durrive*, 902 F.2d at 1228.

The record demonstrates conclusively that the jury was presented sufficient evidence to conclude, beyond a reasonable doubt, that Lechuga conspired with Pagan to distribute cocaine. On May 6, 1988, Milwaukee County Sheriff's Department Detective Kevin Carr, working undercover, negotiated with Pinto to purchase one-half kilogram of cocaine for $13,000. Pinto then informed Pagan that a buyer (Carr) wanted a large stash of cocaine. Pagan proceeded to arrange the transaction. According to Pagan, his drug distribution relationship with Lechuga stretched back to February, 1988. In response to Pinto's message to Pagan that "he had a friend who wanted cocaine," Pagan called his supplier Lechuga and told him "I need this amount" (presumably the half-kilo requested by Carr and Pinto). Pagan did not choose Lechuga's name out of a phone book, nor did he rely on the advice of others in contacting Pagan. Pagan obviously called Lechuga because they had done previous drug deals and had an ongoing supplier-dealer relationship. Their relationship was sufficiently established that all Pagan had to do when he learned of Pinto's desire to buy was pick up the phone, call the defendant Lechuga, tell him he needed cocaine and give him the order. This undercuts any contention that Lechuga and Pagan had an arms-length, adversarial buyer-seller relationship. According to Pagan's testimony, it was not necessary for Lechuga to inquire into Pagan's identity, nor did he ask for references attesting to Pagan's reliability and experience as a drug retailer. He obviously recognized Pagan's voice on the telephone, and a simple call from Pagan was more than sufficient to convince Lechuga without any further checking to initiate the delivery of the half-kilo in what Pagan described as a "kind of dry" drug environment.

According to Pagan, after Lechuga secured the cocaine, Lechuga dictated the sce-

nario for the sale. Lechuga met with Pagan and directed him to an apartment building at 3811 South 35th Street, Milwaukee, Wisconsin where the drug deal would be consummated. Pagan traveled with Pinto and Carr to the drug sale site. Lechuga, carrying a roll of duct tape, arrived at the drug sale site with another man, whom Pagan said Lechuga identified as his brother-in-law. According to Pagan, he went upstairs and from behind an apartment door[3] was handed a brown paper bag by either Lechuga or his companion. Pagan testified that he could not tell who handed him the bag, but, as he accepted the bag, *Lechuga*, whose voice he recognized, stated, "[h]ere's the bag," and directed him to "bring the money back." Lechuga's order from the apartment that Pagan "bring the money back" would allow a rational jury to conclude, in the language of *Townsend*, that Lechuga had a "stake in the success of [the Lechuga–Pagan–Pinto] enterprise." 924 F.2d at 1397. Lechuga was aware that Pagan would deliver the cocaine to a third party, collect the payment from that party, and then return to the drug distribution apartment and give the money to Lechuga as previously directed. Lechuga obviously trusted Pagan to perform these courier functions, because in the drug world where big money is at stake and death is often the penalty for error, nothing is left to chance. Moreover, the fact that Lechuga and Pagan set up the large drug sale so quickly and efficiently suggests that they were familiar with one another. This could have lead a rational jury to conclude that Lechuga and Pagan were not merely in an arms-length buyer-seller relationship, but instead were conspiring to distribute cocaine. As we explained in *Townsend*,

"[c]onspiracies exist ... to lower the transaction costs of committing crimes. Rather than having 'to discover who it is that one wishes to deal with, to inform people that

one wishes to deal and on what terms, to conduct negotiations leading up to a bargain, to draw up the contract, to undertake the inspection needed to make sure that the terms of the contract are being observed, and so on,' in order to accomplish a goal ... conspiracies 'will emerge to organize what would otherwise be market transactions....' *See* Coase, THE FIRM, THE MARKET, AND THE LAW at 6–7 (1988)."

924 F.2d at 1394–95. The fast-moving working relationship Pagan and Lechuga exhibited in arranging the drug transaction is clear evidence that their transaction costs were lowered by the principal's familiarity with one another, another nail in the coffin establishing the well-run, guarded and efficient drug conspiracy headed by Lechuga.

The evidence also demonstrated that at least one other Lechuga–Pagan–Pinto cocaine sale had occurred besides the half-kilo sale that went to Carr. In the bag handed to Pagan from the apartment was a large plastic bag with a half-kilo of cocaine, and three sandwich bags containing one ounce of cocaine each. The half-kilo bag was intended for Carr. At trial, Pagan explained the significance of the three one-ounce packages. Pagan testified that he had relayed to Lechuga Pinto's complaint that he was shorted by Pagan and Lechuga in a prior drug deal. Lechuga made good on the shortage by having Pagan deliver the three ounces due to Pinto to square the books. Pagan stated that he delivered the three ounces to Pinto "[b]ecause *we* had another deal and *we* were short on it." The prosecutor then asked, "[w]hat do you mean you were short on this other deal?" Pagan answered, "*[w]e* had another deal with him and he claimed that *we* were short, so I request from [Lechuga] again the three ounces, and that's why in the bag you guys found a half-key and three ounces." (emphasis added). "We" in this

---

**3.** Detective Carr, a veteran of hundreds of drug investigations during his nearly five years on the Milwaukee County sheriff's department's narcotics squad, testified that he participated in a subsequent police search of the apartment from which Lechuga and his associate delivered the cocaine to Pagan. Inside the sparsely furnished apartment, which was rented in the name of Lechuga's brother, the police found a triple beam scale used to weigh cocaine; a cocaine press used to compact the drug; large plastic bags and generic sandwich bags similar to the ones which contained the cocaine Pagan delivered to Pinto and Carr; and a roll of duct tape bearing, according to the testimony of an FBI fingerprint specialist, Lechuga's fingerprints. These items are the accepted indicia of a drug conspiracy.

exchange meant Pagan and Lechuga; "him" meant Pinto. Thus, according to Pagan, he and Lechuga were a drug-selling team. These facts establish that Lechuga had a conspiratorial agreement with Pagan under which Pagan would locate customers like Pinto and Carr, and then act as the cover and intermediary for Lechuga in the cocaine distribution ring. Pagan was Lechuga's middleman and general helper in his drug distribution. Pagan was locating customers for Lechuga, acting as his conduit for information concerning the particulars of the drug sale, and then transporting the drugs and money between Lechuga and the ultimate customers.[4]

All of these facts, set forth clearly in the record, demonstrate beyond a reasonable doubt that Lechuga was an active participant in conspiring with Pagan to sell drugs to Pinto.[5] That is the only issue we need decide in this case. As I stated previously, I agree with the majority that Lechuga's conspiracy conviction should be affirmed. However, as noted above, I do not believe that it is appropriate for us to answer the single-sale question when the record before us fails to present the issue.

However, I view this case as one which does not compel consideration of the single-large-sale-for-resale question due to its particular facts. Therefore, I would postpone resolution of this challenging question until the court is confronted with a conspiracy conviction that depends solely on a single distribution-size sale. At this point, only informed dicta can result from any analysis of that issue.

Turning to the merits of the case before us, it is my opinion that the evidence of conspiracy is not quite as overwhelming as suggested by Judge Coffey. I believe Judge Cudahy's thoughtful dissent, on the other hand, gives too little weight to the jury's role in deciding difficult cases. After a verdict of guilty, we are obliged to view the evidence and reasonable inferences from it in the light most favorable to the government. This important principle reflects neither pro-government bias nor lazy acceptance of the results in close cases. Rather, it describes the proper deference we give the jury system. Here, the record presents sufficient evidence to support a rational jury's verdict to convict, and we should not interfere with that judgment.

FLAUM, Circuit Judge, concurring.

I agree with the opinions of Judge Posner and Judge Coffey to the extent that they establish that Lechuga's conspiracy conviction is supported by substantial evidence.

KANNE, Circuit Judge, concurring.

I join in the result reached in Judge Posner's opinion—affirmance of Lechuga's conspiracy conviction. I do not believe, however, that the inclusion of dicta that proposes

4. Pagan and Pinto were arrested on the day of the drug sale shortly after Pagan had emerged from the apartment building with the cocaine. Lechuga and his companion were able to evade police capture but they departed in such a hurry that they left behind the Pontiac they drove to the drug sale site. The police seized and impounded the vehicle. Later that evening, according to the testimony of David Lopez, the owner of the Pontiac, Lechuga called Lopez and told him that something must have happened to the car. Lechuga, along with Lopez, returned to the apartment building and discovered the car missing, whereupon Lechuga told Lopez that it must have been stolen. Later that same month, Lechuga was arrested and arraigned, jumped bail, and remained a fugitive until his apprehension in April, 1991 in Chicago, Illinois, carrying a bogus driver's license.

5. In the same memorandum submitted by defense counsel to the trial court which we quoted in footnote 2, defense counsel stated that "[e]ven if Lechuga knew of, and benefitted from, Pagan's subsequent distribution to Pinto, then, the Court could infer only a limited agreement to distribute between Lechuga and Pagan." Lechuga's command to Pagan to "bring the money back" reveals clearly that he knew of the distribution to Pinto (even if he did not know Pinto's name), and expected to benefit from it (in the form of the cash Pagan would ferry back to him). Defense counsel made this admission in trial court papers because they believed that the Lechuga–Pagan conspiracy was "not the conspiracy the indictment charged; *Pinto* was alleged to be a member" (emphasis added). We have previously pointed out that this is an erroneous assumption. Thus, even on the terms laid out by defense counsel in the trial court, Lechuga is guilty of being an active member with Pagan in a conspiracy to distribute cocaine.

356

an absolute rule that a conspiracy conviction can never be supported solely on the basis of a single "large quantity" sale of drugs is necessary or correct. The single sale conspiracy rule is an aside that has not achieved a consensus on this court. I write separately to express my disagreement with this proposed broad rule, the analytical framework for which is grounded in the context of the hand-to-hand drug transaction.

In my view, such a rule cannot reasonably be extended to apply to those multi-million dollar drug transactions found in real life, such as a single sale of a sea-going shipload of marijuana, *United States v. Kramer,* 955 F.2d 479, 482–83 (7th Cir.) (individual deliveries of 15,000, 20,000, 30,000, 14,000, 147,000, 152,000, and 130,000 pounds), *cert. denied,* —— U.S. ——, 113 S.Ct. 595–96, 121 L.Ed.2d 533 (1992), or cocaine, *United States v. Gonzalez,* 933 F.2d 417, 421–22 (7th Cir. 1991) (individual deliveries of 1,148 and 2,265 kilograms), or a cargo aircraft load of cocaine, *United States v. Markowski,* 582 F.Supp. 1276, 1277–78 (N.D.Ind.1984) (importation of 864 kilograms valued at $27,000,-000), or a tractor trailer load of marijuana, *United States v. Canino,* 949 F.2d 928, 934 (7th Cir.1991) (individual deliveries of 27,000 and 18,000 pounds), *cert. denied,* —— U.S. ——, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992). That the foregoing examples involve successive deliveries does not detract from the size and complex nature of each individual transaction.

Even when single sales of drugs are not carried out on such an extraordinary scale, our cases illustrate that major dealers frequently traffick in "large quantities" of drugs. *E.g., United States v. Liefer,* 778 F.2d 1236, 1240 (7th Cir.1985) (individual deliveries of 2,500 and 7,000 pounds of marijuana for distribution); *United States of America v. Wables,* 731 F.2d 440, 442 (7th Cir. 1984) (storage of 2,500 pounds of marijuana for distribution). It is unfortunate, but true, that demand exists for such distributable quantities. *E.g., United States v. Caban,* 962 F.2d 646, 647, 650 (7th Cir.1992) (defendant agreed to purchase twenty kilograms of cocaine and 1,000 pounds of marijuana from undercover agents).

Today the court suggests a prophylactic rule that the sale of "large quantities" of narcotics, without more, cannot sustain a conspiracy conviction. Presumably this rule would apply to a single sale that requires massive coordination of air, sea, and ground transportation, regardless if the buyer is a known large-scale distributor and regardless if the quantity is so large that it is certainly intended for resale. If the rule is adopted, a jury will be precluded from reasonably inferring that a seller of large quantities of drugs agreed to their distribution by others down the line, notwithstanding his interest (and stake) in the retailer's successful distribution.

Ironically, a majority, if not every member, of the court appears to recognize a drug dealer's interest in successful distribution. Judge Posner concedes that "[s]omeone who provides an input into another's business usually cares only about selling the input, not about furthering the other's business. It is different when the buyer is the seller's distributor, without whom the seller cannot reach the market for his product." *Ante* at 348. Judge Cudahy acknowledges as much: "Of course, any wholesaler hopes that his customers will be successful. The more the retailers sell, the more they will buy from the wholesaler." *Post* at 360. Still, a majority insists on a rule that knowledge and a stake in the venture sufficient to prove participation in a conspiracy can never be inferred from evidence of a single large quantity sale.

When one sells an amount of drugs too large for personal consumption to a distributor, I am not willing to foreclose a jury's finding that the seller "join[ed] both mind and hand" with the buyer to make further distribution possible. *Direct Sales Co. v. United States,* 319 U.S. 703, 713, 63 S.Ct. 1265, 1270, 87 L.Ed. 1674 (1943). After all, the large sale transaction is the *sine qua non* of subsequent distribution. Conspiracy can be inferred from prolonged cooperation with another's unlawful purpose, *id.,* (though we affirm Lechuga's conviction on the evidence of only two transactions) but not, apparently, from a transaction involving an extraordinarily large quantity of drugs. Neither Judge Posner nor Judge Cudahy offers an explanation as to why the first inference is

more reasonable and should carry more weight than the second. Surely it cannot be said that "prolonged cooperation" makes it more likely that a seller knew of and agreed to a buyer's distribution of drugs but evidence of an extremely large sale to the distributor does not. Both, it seems to me, could be sufficient to allow "[t]he step from knowledge to intent and agreement [to] be taken." *Id.*

It is true that many drug sales—the hand-to-hand variety—are relatively small and simple transactions, thus preventing a rational factfinder from inferring that the seller joined a drug distribution conspiracy. It is just as true, on the other hand, that there are individual sales of such size and scale that a rational factfinder could properly draw the inference that the seller had joined a conspiracy to distribute the drugs involved.

As I see it, a rule that treats every sale of narcotics in a conspiracy case as if it were a simple spot sale belies the nature and reality of today's wholesale drug trade. Rather than needlessly adopt an absolute standard that cannot be applied intelligibly as the size and complexity of the drug sale increases, we should, I believe, allow the factfinder to assess the nature of the transaction in the first instance and to draw such reasonable inferences of conspiratorial membership as the evidence may warrant.

ILANA DIAMOND ROVNER, Circuit Judge, concurring.

I join that portion of Judge Posner's opinion that finds the evidence of a Lechuga–Pagan conspiracy sufficient to support Lechuga's conviction. Like Judge Flaum, I believe such a result properly defers to the jury's determination of guilt. Although I agree that Lechuga's conviction should be affirmed on this alternative ground, I am not entirely comfortable with the majority's discussion of the primary issue presented in this appeal—the existence of a conspiracy between Lechuga and Pinto. I agree with the majority that the evidence is insufficient to establish a Lechuga–Pinto conspiracy because a conspiracy conviction cannot be sustained solely on the basis of a single large quantity sale. Yet, I find that the majority

offers little practical guidance as to the additional evidence that would be required to support the inference of an agreement to distribute. The majority's proposed standard—"proof of an agreement to commit a crime other than the crime that consists of the sale itself" (Majority Op. at 347)—seems to me self evident, but it ultimately is of limited utility in considering the facts necessary to infer an agreement to distribute. (*See* Cudahy, J., concurring in part and dissenting in part, at 364 n. 9.) I find Judge Cudahy's opinion more helpful in defining the types of evidence that would permit such an inference (*see id.* at 363–64), and I therefore join that portion of Judge Cudahy's discussion.

CUDAHY, Circuit Judge, with whom CUMMINGS and RIPPLE, Circuit Judges, join, concurring in part and dissenting in part.

We took this case en banc to untangle the knotted strands of this circuit's law on the issue of when the relationship of drug seller to drug buyer constitutes a conspiracy. We intended to answer the question, "Is evidence of a sale of drugs in quantities greater than required for personal use enough to support a conviction for conspiracy of the seller with the buyer?" Although the majority indicates in dicta that the answer to this question is "no," it makes little effort to deal with or explain the considerable body of law in this circuit apparently to the contrary. *See, e.g., United States v. Sergio,* 934 F.2d 875, 879 (7th Cir.1991); *United States v. Townsend,* 924 F.2d 1385, 1392 (7th Cir.1991); and *United States v. Roth,* 777 F.2d 1200, 1205 (7th Cir.1985). I happen to agree with the majority that there is very little in this record to support a conspiracy between Lechuga and Pinto (the ostensible buyer), even though that is the very conspiracy specified in the indictment. On the facts before us, Lechuga had no clue as to Pinto's identity or modus operandi but only knew, based on the amount of drugs involved, that Pinto was buying for resale. The majority now says, I think correctly, that *this* is not enough, but unfortunately offers few practical suggestions as to what would be enough.

Instead of a Lechuga–Pinto conspiracy, the majority now focuses on Lechuga–Pagan, a putative conspiracy *not* specified in the indictment but reachable only through its omnibus clause ("other persons known and unknown to the grand jury"). .The majority's approach to the Lechuga–Paga relationship consists of endowing snippets of Pagan's inarticulate testimony with a significance out of all proportion to their apparent import. This is accomplished by indiscriminate reliance on the mantra to "view the evidence in the light most favorable to the government." But the majority offers little to establish workable principles defining conspiracy arising from a buyer-seller relationship. The majority posits the view that, in order to sustain a conspiracy allegation, there must be an agreement going beyond the simple agreement to buy and sell. So far so good, but the majority offers little insight into what facts would establish such a thing. The majority concludes that the Lechuga–Pinto relationship is not enough but that the Lechuga–Pagan link is. Because the basic features of these relationships are essentially the same, however, we are left to wonder what constitutes a conspiracy and what does not.

Lechuga's primary argument on appeal assumes that there was sufficient evidence to identify him as the man who sold cocaine to Pagan. Nonetheless, he argues that there was insufficient evidence to prove that he *conspired* with anyone to distribute cocaine. Instead, even when taken in the light most favorable to the government, Lechuga contends that the evidence shows nothing more than a few isolated sales transactions, not a conspiracy.

The principal focus of the trial and of this appeal has been the existence of an alleged conspiracy between Lechuga and Pinto. The majority offers plausible reasons why there is no Lechuga–Pinto conspiracy. But it does so in the face of authority in this circuit that the charge of a sale for resale *is* a sufficient allegation of conspiracy. *See, e.g., Sergio*, 934 F.2d at 879 ("When a dealer buys for resale from another dealer . . . it is reason-

able to infer 'a limited agreement to distribute' between the two dealers.") (quoting *Townsend*, 924 F.2d at 1392); *Roth*, 777 F.2d at 1205 (middleman who sells drugs to user is a conspirator with the drug supplier). The theory of these cases seems to be that the mere *knowledge* by the seller that the buyer would redistribute the drugs is enough to constitute a conspiracy. But the *sine qua non* of a conspiracy is not merely knowledge but an *agreement* to commit a crime, *United States v. Blankenship*, 970 F.2d 283, 285 (7th Cir.1992), the existence of which depends upon a meeting of two or more guilty minds. *See* 4 Charles E. Torica, *Wharton's Criminal Law* § 726 at 531 (14th ed. 1981). The record reveals that, although Lechuga knew that a redistribution of cocaine was contemplated, he knew nothing about the identity of the reseller or the expected plan of redistribution.[1] There is no evidence that Lechuga ever had a meeting of the minds with Pinto, or agreed to join a drug distribution enterprise of which Pinto was a member.

The majority agrees with this analysis and in fact concludes that a conspiratorial "meeting of the minds" is generally narrower than a "contract." *Ante* at 348–49 ("[S]ome legally enforceable contracts do not involve a 'real' agreement in the sense of a meeting of the minds but are enforced because the parties uttered words or engaged in acts that the law deems sufficient to create a . . . contract. In this respect the term 'agreement' is narrower than 'contract.' "). Again, so far so good, but, if there is no conspiracy involving Pinto, how can there be one involving Pagan? For Pagan acted here on behalf of Pinto—in effect as Pinto's agent for the purchase of cocaine. If there is no conspiracy with the principal, Pinto (as the majority finds), how can there be one with the agent? Of course, the facts must be viewed in the light most favorable to the government, but this does not mean that the facts may be viewed as a springboard for pure speculation. And that is all the majority has provided.

The majority has attempted to elevate Pagan from Pinto's purchasing agent to an inti-

---

**1.** The majority engages in imaginative but wholly insupportable speculation that "Lechuga might have been frightened to deal face to face with

Pinto, whom he had short-changed. . . ." *Ante* at 347. The fact is that Lechuga never had an opportunity to deal face to face with Pinto.

mate of Lechuga who "agreed" with Lechuga to foster the redistribution of the cocaine. The majority builds its case on a remarkably flimsy foundation: Pagan had become acquainted with Lechuga before the transaction in question; and Pagan in testimony once used the pronoun "we" to indicate delivery of cocaine originating with Lechuga and passing through the hands of Pagan on its way to Pinto. Also, the sale from Lechuga to Pagan, acting on behalf of Pinto, was apparently done on credit. These are facts from which one might indulge in speculation about agreement, but they do not, in the best of circumstances, give rise to a rational inference of conspiracy.

Pagan admittedly had met Lechuga before this transaction. Pagan's acquaintanceship with Lechuga, however, was not sufficiently close to enable Pagan to distinguish Humberto Lechuga from his brother, Raul. In any event, we may assume that the mine-run of narcotics purchasers are acquainted with their sellers. There is nothing to suggest that drug dealers do business only with strangers. From acquaintanceship alone it is certainly not permissible to infer a meeting of the minds—an agreement. This is even more emphatically the case where one party mistakes the other for his brother. The majority also quotes Pagan as testifying, "We had another deal with him [Pinto] and he claimed that we were short, so I request from [Raul] [Lechuga] again the three ounces." *Ante* at 350–51. Particularly considering that to Pagan English was a second, and still somewhat foreign, language, there is no basis for inferring an agreement from this offhand comment. For an intermediate seller to include his supplier in the sweep of the plural pronoun "we" in a statement that both he and his supplier would have to make up for a short delivery is hardly grounds for inferring a conspiracy.

The very circumstances of the transaction suggest that, while there may have been an agreement between Pagan and Pinto to arrange for the purchase of cocaine, there certainly was none between Lechuga and Pagan

to *distribute* it. First, undercover detective Carr sought to buy 500 grams of cocaine from Pinto. Pinto then called Pagan to obtain the drugs. Pagan, in turn, called Lechuga to set up the purchase. Then, Carr, Pinto and Pagan drove to an apartment building where Lechuga had indicated he would make delivery. Lechuga was not there, so Pagan sought further instruction from a woman later identified as Lechuga's sister-in-law. The woman told Pagan that Lechuga was then on his way to the pick-up point. Pagan and his associates returned to the apartment building and, a few minutes later, Lechuga and a companion arrived. Pagan met Lechuga in the building and took delivery of 481 grams plus 3 ounces of cocaine. More specifically, Pagan took the cocaine from someone, later identified as Lechuga, who stuck his hand out from behind a partially open door. Pagan returned to his associates and gave the 481 grams to Carr and the 3 ounces to Pinto. Pinto and Pagan were subsequently arrested but Lechuga and his companion had already departed. These circumstances may support an inference that Pagan was an agent and a coconspirator of Pinto, but nothing about them suggests a conspiracy with Lechuga. Literally, as well as figuratively, the dealings with Lechuga were at arm's length.

The majority's reference to Pagan as a possible "go-between, facilitator, sales agent, and general helper," *ante* at 350, merely makes colorful, but misleading, verbiage substitute for analysis. There is no evidence that Pagan *agreed* with Lechuga to do anything except to buy drugs on behalf of Pinto and, under the majority's very analysis, this is not enough.[2] There is no agreement going beyond the agreement to buy and sell itself. To call someone a "middleman" or a "facilitator" does not make him a coconspirator with either the party above him or the party below him in the chain of distribution. A "middleman" or a "facilitator" is a buyer who also sells or a seller who also buys. Calling someone a "middleman" certainly does not

**2.** In the words of the majority, "If Lechuga and Pagan had the same simple seller-buyer relationship as Lechuga and Pinto, then, for the reasons explained earlier, there was no conspiracy between them." *Ante* at 350. The fact is that Lechuga dealt with Pagan as Pinto's buying agent. Lechuga's relationship to Pagan was identical to his relationship to Pinto.

permit an inference that he has, by this activity alone, become part of a larger distribution operation and entered the realm of conspiracy.

The case law in this circuit remains tangled, and I doubt that the majority opinion provides serviceable guidelines to dispel the confusion. Thus, the government has pointed to the language of some of our cases and argued that a sale for resale is evidence enough for the jury "to infer a limited agreement to distribute between the two dealers." *United States v. Sergio,* 934 F.2d 875, 879 (7th Cir.1991). *See also United States v. Koenig,* 856 F.2d 843, 854 (7th Cir.1988).

But the proposition that a sale for resale is sufficient evidence of participation in a conspiracy runs headlong into *United States v. Baker,* 905 F.2d 1100 (7th Cir.1990).[3] In *Baker,* one defendant, Wireman, was convicted of conspiracy based on his purchase of 200 pounds of "ditch weed," a noxious, low-quality variety of marijuana which no single individual could possibly consume in such quantities. In the opinion, we stated that even a large purchase does not demonstrate that the defendant "knew the existence and scope of the conspiracy and sought to promote its success ... any more than a purchase of 100 tons of steel to build a skyscraper shows that the buyer has 'joined' the corporate enterprise of the manufacturer." *Id.* at 1106 (citations omitted). The proposition that a sale for resale is enough is also explicitly rejected in *Lamon,* which notes that the conviction in *Koenig,* 856 F.2d 843, was based not only on the large volume of the purchases but also on the extensive cooperation between the buyer and the seller. *Lamon,* 930 F.2d at 1191 n. 18.

One possibility on the facts of this case is that Lechuga joined an ongoing conspiracy between Pagan and Pinto. But although Lechuga presumably knew that Pagan would resell or reconvey the cocaine, he did not know to whom or in what manner. If the language of *Baker* governs, Lechuga did not

know the "scope" of the putative Pagan–Pinto conspiracy. 905 F.2d at 1106. Knowledge of a buyer's illegal objectives does not establish an agreement to help him carry out those objectives. *United States v. Durrive,* 902 F.2d 1221, 1225 (7th Cir.1990) ("[M]ere knowledge of, approval of, association with, or presence at a conspiracy is insufficient to establish [a defendant's participation in a conspiracy]."). As we noted in *Townsend:*

> The suppliers in a "chain" are not necessarily interested in the success of a particular retailer, or group of retailers, down the line. If the chain is characterized by sporadic dealings between independent dealers, what do suppliers care if the middlemen are able to unload the stuff further?

924 F.2d at 1391. Of course, any wholesaler hopes that his customers will be successful. The more the retailers sell, the more they will buy from the wholesaler. But proving participation in a conspiracy requires "substantial" evidence. *Durrive,* 902 F.2d at 1225–30. This presumably means that proof of more than an abstract desire for more business is required.

An appropriate standard of proof of conspiracy helps ensure that vicarious responsibility will not be improperly assessed. Co-conspirators are liable for crimes committed by other members of the conspiracy in furtherance of the conspiracy. *Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946). To hold that a defendant joined a conspiracy therefore exposes that person to much more than criminal liability for joining the conspiracy itself: he also faces conviction for the substantive crimes committed by other members of the conspiracy. *Townsend,* 924 F.2d at 1389. In *Townsend* we also stated: "To join a conspiracy ... is to join an agreement.... [T]o be a conspirator you must know of the agreement ... and intend to join it...." *Id.* at 1390 (citations omitted).[4] Here Lechuga had no adequate knowledge of any agree-

---

**3.** Three defendants in *Baker* petitioned for certiorari. The Supreme Court denied all three. *Baker v. United States,* 498 U.S. 876, 111 S.Ct. 206, 112 L.Ed.2d 167 (1990); *Manns v. United States,* 498 U.S. 904, 111 S.Ct. 270, 112 L.Ed.2d 226

(1990); *Manns v. United States,* 498 U.S. 1030, 111 S.Ct. 686, 112 L.Ed.2d 677 (1991).

**4.** Knowledge is thus a necessary but not a sufficient precursor to participation in a conspiracy.

ment between Pagan and Pinto (whose very identity was unknown to Lechuga). Although Lechuga supplied cocaine to the Pagan–Pinto distribution chain through two apparently arm's-length sales to Pagan, Lechuga was wholly unaware of what activities Pagan, or any subsequent occupier of a place in the chain of distribution, might undertake. The relationship of Lechuga to Pagan is simply that of seller to buyer or to buyer's agent. The sale was consummated by Pagan taking delivery on Pinto's behalf. For his part, Pinto gave an order to Pagan and Pagan saw that it was filled. None of this in any way changed the simple seller-buyer relationship between Lechuga and Pagan. And, as we have said repeatedly (but unfortunately not consistently) elsewhere, a buyer-seller relationship, standing alone, is insufficient to prove participation in a conspiracy. *See Townsend,* 924 F.2d at 1394; *Baker,* 905 F.2d at 1106. *But see United States v. Sergio,* 934 F.2d 875 (7th Cir.1991); *Townsend,* 924 F.2d at 1392; *United States v. Roth,* 777 F.2d 1200, 1205 (7th Cir.1985).

*United States v. Roth* seems to contain a less demanding test for conspiracy than, for example, *Sergio,* and includes the following passage: "[W]hile the ultimate consumer is not himself a conspirator ... the middleman is." 777 F.2d at 1205. It is true that this language appears as dicta in the middle of a discussion of prosecutorial misconduct before a grand jury. It is also possible that the passage has no application to mere dealers but only to a somehow more entangled species of "middlemen." And, in context, the panel in *Roth* may have been referring to parties who were acting as agents of the defendant. *Id.* ("The risk of Roth's being caught would have been overwhelming. He had to have middlemen between him and the drug addicts who were his ultimate consumers."). As previously noted, here Pagan—a man in the middle if not a "middleman"—was acting on behalf of the buyer to fill the buyer's order.

The significant passage in *Sergio,* suggesting a broad inference to be drawn from the sale of substantial quantities of drugs, may be best read as a loose reference to *Townsend,* where we cited *Baker* approvingly, 924 F.2d at 1394, and used language that was rather more precise than in *Sergio:* "If [wholesale dealer] A knows of, and benefits from, [retail dealer] B's subsequent distribution, we may infer a limited agreement to distribute between A and B.... But agreement to join *other* endeavors and distributors cannot be drawn merely from knowledge the buyer will use the drugs illegally." *Id.* at 1392 (internal quotations omitted). It may also be significant that in *Sergio* itself, and in the cases that cite *Sergio* with approval, there was substantial evidence of the defendant's involvement in the charged conspiracy, above and beyond the sale for resale. *Sergio,* 934 F.2d at 879 (noting the defendant's "continuous involvement with the conspiracy"); *United States v. Thompson,* 944 F.2d 1331, 1342–43 (7th Cir.1991) (deals at issue were "more than isolated arms-length transactions" and "reveal[ed] a high degree of trust and cooperation"), *cert. denied,* —— U.S. ——, 112 S.Ct. 1177, 117 L.Ed.2d 422 (1992); and *United States v. Atterson,* 926 F.2d 649, 655 (7th Cir.) (regular purchases and drug sales records suggest that defendant was "warehouseman" for the marijuana), *cert. denied sub nom. Laurelez v. United States,* —— U.S. ——, 111 S.Ct. 2909, 115 L.Ed.2d 1072 (1991).

Perhaps anticipating that we might not strictly apply the language of *Sergio,* the government has also argued that the extra three ounces that Lechuga delivered to Pagan, who in turn delivered them to Pinto, indicate a sort of ongoing relationship of trust from which the jury could infer a conspiracy. But these additional ounces do nothing to change the role of Lechuga as an arms-length supplier to the Pagan–Pinto chain. They indicate merely that Pagan had bought cocaine from Lechuga once before and that Lechuga was a sufficiently honest broker to make up for a short delivery.[5] Certainly, these facts, or similar facts, might well be found in any number of other typical arms-length sales. In sum, it is fair to con-

---

**5.** Perhaps there is honor among "thieves." And I cannot imagine that a drug dealer who habitually shorted his customers would stay in business long. There is nothing extraordinary here from which conspiracy might be inferred.

clude, even though some of our cases suggest otherwise, that there is not sufficient evidence to support an inference that Lechuga joined or participated in a Pagan–Pinto conspiracy.

The possibility remains that Lechuga and Pagan, without reference to Pinto, together agreed separately to distribute cocaine. The majority finds such a conspiracy between Lechuga and Pagan on the grounds that Pagan knew Lechuga was a drug dealer and knowing this "assisted him in distributing drugs to at least one dealer farther down the chain of distribution...." *Ante* at 350. I suppose that every cocaine supplier who sells to a reseller "assists" the reseller in the sense that, without the original provision of a supply, the reseller would have nothing to pass on down the line. This merely describes the economics of distribution; however, it does not address the occurrence of a meeting of the minds. There is abundant authority that Pagan's activities vis-a-vis Lechuga are insufficient to prove a conspiracy. *United States v. Kimmons,* 917 F.2d 1011, 1015 (7th Cir.1990); *United States v. Mancillas,* 580 F.2d 1301, 1307 (7th Cir.), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978).

The majority purports to distinguish the dealings between Lechuga and Pagan from those between Lechuga and Pinto. Even the second leg (Lechuga–Pinto) of this comparison has its difficulties since Lechuga did not even know who Pinto was and had no direct dealings with him. A seller-buyer relation between Lechuga and Pinto can be postulated only on the theory that Pagan acted as Pinto's agent in making the purchase from Lechuga. In any event, the majority correctly states that to establish a conspiracy, either between Lechuga and Pinto or Lechuga and Pagan, there must be "proof of an agreement to commit a crime other than the crime that consists of the sale itself." *Ante* at 347. But what is lacking here is evidence from which such a further agreement between Lechuga and Pagan rationally can be inferred.

Lechuga and Pagan did sell and buy cocaine, and apparently they agreed to do so some time before the sale was consummated.

But this sales agreement alone may not form the basis for affirming Lechuga's conviction for conspiring to *distribute* cocaine. Like the majority, I too look for "proof of an agreement to commit a crime other than the crime that consists of the sale itself." Specifically, I search for an agreement to distribute cocaine. The issue in this case, as I see it, is what evidence will permit an inference that such an agreement to distribute exists. The majority does not provide a satisfactory answer to this question.

As has been repeatedly noted, a conspiracy requires *agreement,* and there is a difference between knowing that something will occur—even as an absolute certainty—and agreeing to bring that same "something" about. After all, the relationship between a buyer and seller is presumptively adversarial: "the buyer's purpose is to buy [presumably at the lowest possible price]; the seller's purpose is to sell [presumably at the highest possible price]." *United States v. Ford,* 324 F.2d 950, 952 (7th Cir.1963). Hence, to find an agreement to cooperate in distributing cocaine requires evidence going considerably beyond the mere existence of a buyer-seller relationship.

Here the record shows clearly only that Lechuga and Pagan had been acquainted since February 1988, and that prior to their arrest in May 1988 Lechuga twice sold Pagan cocaine. Pagan, acting independently, then redistributed it to Pinto. Obviously, this evidence permits an inference of an existing supplier-dealer relationship, but this is not a relationship from which a conspiracy to distribute can be inferred. Thus, in *Direct Sales v. United States,* 319 U.S. 703, 713, 63 S.Ct. 1265, 1270, 87 L.Ed. 1674 (1943), the Court upheld the conspiracy conviction of a morphine wholesaler that knew that its physician-customer was selling the morphine to addicts. This conclusion, however, emerged only after the Court emphasized the company's "prolonged cooperation with [the physician's] unlawful purpose." *Id.* The Court distinguished the case from one involving "single or casual transactions, not amounting to a regular course of business, regular, sustained and prolonged, and involving nothing more on the seller's part than indifference to

the buyer's illegal purpose and passive acquiescence in his desire to purchase, for whatever end." *Id.* at 712, n. 8, 63 S.Ct. at 1269, n. 8. *Compare United States v. Falcone,* 311 U.S. 205, 208, 61 S.Ct. 204, 205, 85 L.Ed. 128 (1940) (conspiracy conviction overturned when evidence did "not do more than show knowledge by respondents that the materials would be used for illicit distilling. . . ."). The case before us is much more like *Falcone* than like *Direct Sales;* a conspiratorial agreement to distribute cocaine cannot be inferred from evidence of two arm's-length sales transactions, even between dealers who had met three months earlier. There is nothing about these sales to suggest that they are out of the ordinary.

The majority concludes that the record is replete with evidence of the "something more" that permits an inference that Lechuga and Pagan were conspirators. For example, some of its members point to evidence that Lechuga was willing to sell cocaine after "a simple call from Pagan." *Ante* at 353 (Coffey, J., concurring). I fail to see how this suggests anything beyond an ordinary buyer-seller relationship. Lechuga had admittedly sold to Pagan once before and, when Pagan exhibited a desire to buy again, Lechuga was apparently pleased to oblige. Willingness to please and good service do not add up to conspiracy. To call these few typical transactions a conspiracy is inconsistent with *Direct Sales* and *Falcone.*

It has also been suggested that Lechuga's instruction to Pagan to "bring the money back" shows that Lechuga "had a 'stake in the success of [the Lechuga–Pagan–Pinto] enterprise.' " *Ante* at 353–54 (Coffey, J., concurring) (quoting *Townsend,* 924 F.2d at 1397). But the circumstances show only that Pagan bought on credit, and a credit transaction standing alone in no way changes the adversarial relationship between a buyer and seller. *See Baker,* 905 F.2d at 1106. This

was *not* a sale on consignment, in which Pagan had the option of paying Lechuga for the cocaine or returning any unsold amount. Such an arrangement would indeed link Lechuga's economic benefit from the transaction to Pagan's success in distributing the cocaine. But here, the only rational inference to be drawn from the instruction "bring back the money" is that Pagan had to pay for the cocaine irrespective of his ability to resell it.[6] If it means anything, this evidence suggests that Lechuga had implicitly refused to enter into a distribution agreement with Pagan; Lechuga had declined to take a stake in Pagan's success or that of any larger enterprise.[7]

All this discussion raises the crucial question: If a sale for resale is not enough evidence of a conspiracy, what is? Although no exhaustive catalog is possible, examples are not difficult to find. Clearly, "prolonged cooperation" between buyer and seller is sufficient evidence of a conspiracy to distribute drugs. *Direct Sales,* 319 U.S. at 713, 63 S.Ct. at 1270.[8] So too might be evidence that the putative buyer is really working as the seller's agent. Such evidence would, in many circumstances, destroy the presumption that the parties are dealing at arm's length and would show an agreement to distribute. Sales on consignment may also establish a conspiracy since they indicate an ongoing relationship of the sort that "lower[s] the transaction costs of committing crimes," *Townsend,* 924 F.2d at 1394, and also show that the seller has a "stake in the success of [the buyer's] enterprise." *Id.* at 1397. *See United States v. Saunders,* 973 F.2d 1354, 1360 (7th Cir.1992) (a single consignment transaction may support an inference of conspiracy), *cert. denied,* —— U.S. ——, 113 S.Ct. 1026, 122 L.Ed.2d 171 (1993). Evidence that the parties had standardized their transactions with one another might also lead to an inference that they were engaged in a

---

6. Drug dealers, like most participants in an underground economy, likely have effective collection methods.

7. Pagan was an independent businessman who purchased cocaine from Lechuga to supply his own customers, and Lechuga had no direct pecuniary interest in his success.

8. On this point, I agree with the majority: "Prolonged cooperation is neither the meaning of conspiracy nor an essential element, *but it is one type of evidence* of an agreement that goes beyond what is implicit in any consensual undertaking, such as a spot sale." *Ante* at 350 (emphasis added).

cooperative effort. We also noted recently that evidence of "trust" and "mutual benefit" will support a conspiracy conviction, even though the parties' dealings appear to involve merely a "simple sale of cocaine." *United States v. Goines*, 988 F.2d 750, 764 (7th Cir. 1993). *See generally United States v. Blankenship*, 970 F.2d 283, 286–89 (7th Cir.1992) (discussing the "line of demarcation" between sale and conspiracy).[9]

In sum, the evidence shows nothing more than a typical buyer seller relationship between Lechuga and Pagan. Further, Lechuga did not have the requisite knowledge of Pagan's arrangements with Pinto to be said to have joined that purported conspiracy. Accordingly, Lechuga's conviction for conspiracy must be reversed. I, therefore, respectfully dissent in the matters indicated.

**9.** The majority has implied that citation of these factors pointing to conspiracy is too generalized to be of much help in the future. But the majority's efforts at a bright-line rule are even more unavailing. The majority's carefully crafted rule does little more than state the obvious: to prove a conspiracy to distribute cocaine one must show something more than an agreement to sell, in fact, one must show an agreement to distribute. This statement, however, offers no insight into the facts from which such an agreement may be inferred. My answer to the difficult question, "What more than a sale for resale is necessary to prove a conspiracy?" is multi-faceted. This is inescapable since this is the only way to take into consideration the many variables that distinguish knowledge that something will occur, e.g., subsequent distribution, from an agreement to bring that something about.