UNITED STATES of America, Plaintiff–Appellee, Cross–Appellant,

v.

Martin A. "Marty" SAX, Defendant–Appellant, Cross–Appellee.

Nos. 93–3063, 93–3288.

United States Court of Appeals, Seventh Circuit.

Argued June 8, 1994.

Decided Nov. 7, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 6, 1995.

Bradley W. Murphy, Asst. U.S. Atty., Rodger Heaton, Office of U.S. Atty., Peoria, IL, for U.S. in No. 93–3063.

K. Tate Chambers, Asst. U.S. Atty., Rodger Heaton, Bradley W. Murphy, Asst. U.S. Atty., Peoria, IL, for U.S. in No. 93–3288.

Allan A. Ackerman (argued), Chicago, IL, Thomas A. Durkin (argued), Durkin, Morgan, Roberts, Barnett & Bley, Michigan City, IN, for Martin A. Sax.

Before ALARCON,* RIPPLE and MANION, Circuit Judges.

MANION, Circuit Judge.

An undercover drug investigation named "Operation Adobe" targeted the distribution of large quantities of marijuana coming out of Tucson, Arizona for delivery and distribution into the Quad Cities areas of Illinois. As a result of the investigation, defendant Marty Sax was indicted along with several others. Following a jury trial, Sax was convicted of one count of conspiracy to distribute marijua-

na, in violation of 21 U.S.C. §§ 846 and 841, and two counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). The district court sentenced Sax to 210 months in prison. Sax appeals his convictions; the government, in a cross-appeal, challenges the district court's refusal to apply a four-level upward adjustment under U.S.S.G. § 3B1.1(a) for Sax's role in the offense, as well as its refusal to give Sax a two-level upward adjustment under U.S.S.G. § 3C1.1 for obstruction of justice. We affirm Sax's convictions and remand to the district court for resentencing.

## I. Background

In the early 1980's Marty Sax started a large-scale marijuana distribution ring that was based out of Tucson, Arizona and reached into Illinois. In September of 1982, Sax recruited Michael Cutkomp to distribute Sax's marijuana in the Quad Cities area[1] of Illinois. Soon thereafter, Cutkomp began receiving from Sax one-pound shipments of marijuana in the mail. Cutkomp would break these shipments into smaller amounts which he in turn would parcel out to his own distributors, including Dan Burkhead, Anthony Carmack and later, Dan's brother, Scot Burkhead, and Danny Brown. Cutkomp would front the marijuana to his distributors, who would repay him out their resales. Cutkomp would then use these proceeds to purchase more marijuana from Sax.

The methods of delivery changed as Cutkomp began purchasing larger quantities of marijuana. At the outset, Cutkomp would fly to Arizona, taking with him several empty suitcases. Once he arrived, he would call Sax who would meet Cutkomp at his hotel, take his suitcases and return them filled with marijuana; Cutkomp, with the marijuana-filled suitcases, would then fly back to Illinois where the shipment was broken down and parceled out to Cutkomp's distributors. By late 1983, Cutkomp started purchasing Sax's marijuana in one-hundred-pound increments. To accommodate these larger shipments, Sax recruited several drivers, including William

* Hon. Arthur L. Alarcon, of the Ninth Circuit, sitting by designation.

1. The "Quad Cities" refers to an area in northwest Illinois and eastern Iowa which includes the cities of Rock Island and Moline in Illinois, and the cities of Davenport and Bettendorf in Iowa.

Wainwright and Tom O'Donnell, to drive the marijuana from Arizona to Illinois. They would drive to a house owned by Sax named the "Cactus Ranch," located on the east side of Tucson, in which large quantities of marijuana were stored. Once there, the drivers would load up the vehicles with marijuana and drive to Illinois where the shipment would be delivered pursuant to Cutkomp's instructions.

In 1985 Cutkomp and his wife Karin (who was also involved in her husband's marijuana business) moved to Tucson. From there the Cutkomps continued distributing marijuana into Illinois using various drivers, including Cutkomp himself, his mother-in-law, Rosina Jech, and Danny Brown's brother, William Brown. Once the shipments arrived in Illinois they would be delivered to Danny Brown and then to Scot Burkhead. At other times, only part of the shipment would be delivered to Brown and Burkhead; the rest would be driven to Chicago where it was delivered to Joe Cullinane, who, according to Burkhead's testimony, was another one of Cutkomp's distributors.

Meanwhile, Sax had been mentioning to several people that he no longer wanted to be personally involved in the distribution side of the marijuana business. To that end, sometime in late 1984 or early 1985, Sax recruited Ted Eichorn to begin filling orders for Sax's distributors. The record shows that sometime in 1985, Sax sold his distribution business to Ted Eichorn. The price was $50,000, which was to be paid out of Eichorn's future sales. Until Eichorn paid off the balance, Sax retained the right to take back his business.

Eichorn managed things fairly well at first. He filled Cutkomp's orders just as Sax had done. He also filled orders from Joe Cullinane, who, in addition to selling for Cutkomp, had been placing his own orders with Sax. Eichorn even managed to expand Sax's existing operations. Wainwright, one of Sax's drivers, started placing his own orders with Eichorn. At Wainwright's suggestion, Eichorn fronted marijuana to Wainwright's friend, John Heller, who would distribute marijuana in Illinois. For getting Heller started, Eichorn agreed to pay Wainwright a kickback of Heller's sales.

Eichorn, however, was a heroin addict, and soon became an unreliable supplier. He would frequently refuse to answer his customers' pager calls. At other times, he would simply engage in bizarre behavior which demonstrated his unreliability. Sax's former customers expressed their frustrations to Sax. In late 1985, Cutkomp and Cullinane met with Sax in a Tucson hotel to complain about Eichorn. Following a heated discussion with Cutkomp and Cullinane, Sax apparently got Eichorn back in line, for the record indicates that Eichorn resumed supplying Cutkomp and Cullinane with marijuana. It was not long, however, before Eichorn's distribution process fell into disarray. So in late 1986, Cutkomp and Cullinane, fed up with Eichorn's antics, stopped purchasing marijuana from Eichorn and began purchasing their marijuana from Jeff Curtis, another marijuana distributor living in Tucson.[2]

This was not the end of Sax's involvement with his distributors, however. Even before he turned things over to Eichorn, Sax, who was also a realtor, had been involved in setting up real estate investments into which his distributors could deposit their drug proceeds. For instance, in 1985, Sax introduced Eichorn to Joel Abrams, a Tucson realtor, so that Eichorn could purchase 10 acres of real estate. Abrams, who at the time was unaware of Sax's and Eichorn's drug activities, thought it unusual when Eichorn reached into his attache case and pulled out $10,000 in cash as his down payment. Later, Sax began soliciting his distributors to invest money in various limited partnerships that Sax and Abrams had formed to purchase real estate in and around Tucson. In December of 1985, Sax and Abrams set up Corona Northwest Associates I ("CNA I"), a real estate limited partnership in which Sax and Abrams were the general partners. Sax provided nearly half of the limited partners in CNA I through soliciting investments from his various distributors, most notably Cutkomp and Wainwright. In December of 1985, Wainwright subscribed to two shares in

---

**2.** For all of his failings Eichorn apparently left the scene at the right time. The record indicates that he has evaded prosecution and remains a fugitive.

CNA I; at that time, he informed Sax and Abrams that he was purchasing one of these shares for Eichorn. Also in December of 1985, Cutkomp subscribed to one share in CNA I, to be put in the name of his mother, Margaret Cutkomp. Cutkomp and Wainwright (on behalf of himself and Eichorn) continued making their annual limited partnership payments to CNA I, frequently in cash. In March or April of 1987, Sax and Abrams set up another real estate limited partnership, Corona Marana IV ("CM IV"), in which they were both general partners. Abrams needed investors so he turned to Sax who, in turn, solicited money from his former courier Tom O'Donnell. O'Donnell agreed and subscribed to one share. He would send his annual payments (many times in cash) to Sax who would then personally deliver them to Abrams. Finally, in the summer of 1987, Sax and Abrams set up another limited partnership, Corona Pinal Partners V ("CPP V"). Again, Sax provided several investors, including O'Donnell and John Heller.[3]

In 1988 the authorities began closing in on the distribution ring. In October of 1988, Illinois authorities executed a search at Scot Burkhead's home where they found marijuana and evidence that pointed to the Cutkomps. In February of 1989, the Cutkomps (who had moved back to Illinois in May of 1988), fled Illinois with nearly $300,000 in cash and headed for Mexico. On their way out of the country, the Cutkomps stopped off in Tucson and informed Sax of the Illinois investigation. They also, through a third party, gave Sax $4,125 in cash as their annual contribution to CNA I. Sax, in turn, handed this cash over to Abrams on or about February 17, 1989. Abrams' wife, Cheryl, who did the bookkeeping for the limited partnerships, deposited Cutkomp's cash into CNA I on or about April 28, 1989.

On April 20, 1989, Captain Richard Fisher of the Rock Island, Illinois Sheriff's Department, along with Special Agent Moore of the Internal Revenue Service (both of whom were involved in Operation Adobe) came to Tucson to question Sax about his involvement in the Quad Cities marijuana distribution ring. During that interview, the agents informed Sax that they had information linking

him to Cutkomp. Sax denied being involved in Cutkomp's drug activities. He also denied receiving drug monies and investing them in any of the limited partnerships. Sax told Fisher and Agent Moore that although Cutkomp was listed as a limited partner in CNA I, the money received was actually that of Cutkomp's mother. Fisher and Agent Moore then served a subpoena on Sax requiring him to bring any records of his transactions with Cutkomp to the grand jury. After the authorities left, Sax, that same day, went to see Abrams. When he arrived, Sax informed Abrams that he (Sax) and Cutkomp were being investigated for drug activities, and asked Abrams to hand over all the investment records for the limited partnerships. Abrams initially refused, but later agreed to give Sax the record of Cutkomp's investments into CNA I.

On May 7, 1992, a federal grand jury in Peoria, Illinois indicted Sax, Eichorn, O'Donnell, and Curtis with one count of conspiring between themselves and others, including Mike Cutkomp, to knowingly conspire to distribute over 1,000 kilograms of marijuana in violation of 21 U.S.C. §§ 846 and 841(a)(1). The indictment charged that, as part of the conspiracy, Sax and others "would and did transmit and cause to be transmitted a portion of these drug proceeds to others for the purposes of laundering those drug proceeds to conceal the nature and source of the drug proceeds." On September 9, 1992, the grand jury issued a superseding indictment, in which they additionally charged Sax with two counts of money laundering, one on or about February 12, 1988, the other on or about March 25, 1988, both in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and 18 U.S.C. § 2. Many of the codefendants pleaded guilty; Sax pleaded not guilty and proceeded to trial. Following a ten-day jury trial, Sax was convicted as charged.

At sentencing, the district court calculated Sax's base offense level at 37. This, in conjunction with Sax's Criminal History Category of I, gave Sax a Guidelines sentencing range between 210 and 262 months. The government requested that the district court

---

**3.** Although the limited partnership only referred to the investor as "Heller," the record indicates that the investor's subscription form was signed by John Heller.

impose a four-level adjustment under U.S.S.G. § 3B1.1(a) based on Sax's role in the offense, and a two-level upward adjustment under U.S.S.G. § 3C1.1 based on Sax's attempts to obstruct justice. The district court denied the government's requests, giving only a three-level increase under § 3B1.1(b), and sentenced Sax to 210 months in prison.

Sax raises a host of issues in this appeal but only a few deserve any extended discussion. These include a challenge to the sufficiency of the evidence supporting Sax's conspiracy conviction, a claim that Sax's prosecution for conspiracy was barred by the applicable statute of limitations, and a challenge to the jury instructions on money laundering. The government cross-appeals, claiming that the district court erred in denying the additional upward adjustments to Sax's sentence.

## II.

### A. Sufficiency of the Evidence

Sax claims that the district court erred in denying his motion for judgment of acquittal under Fed.R.Crim.P. 29(c), claiming that there was insufficient evidence to support his conspiracy conviction. He maintains that the government failed to prove a conspiracy among Sax and the other defendants; instead, he claims that the government's evidence, at best, demonstrates a buyer-seller relationship between Sax and the various defendants, which, by itself, is not enough to establish the existence of a conspiracy.

■ The proper standard of review of a district court's denial of a judgment of acquittal, pursuant to Fed.R.Crim.P. 29(c), is *de novo. See United States v. Castaneda–Cantu,* 20 F.3d 1325, 1330 (5th Cir.1994). This simply requires that we review the defendant's motion by the same standard applied by the district court, which means that the motion to acquit should be granted if "the evidence is insufficient to sustain a conviction." 2 Charles A. Wright, *Federal Rules of Criminal Procedure* § 467 at 655 (1982). And our standard for reviewing the sufficiency of the evidence is certainly well-settled: "We review the evidence and all the reasonable inferences in the light most favorable to the government, and will reverse a conviction only if no rational trier of fact could have

found the essential elements of the offense charged beyond a reasonable doubt." *United States v. Zarnes,* 33 F.3d 1454, 1465 (7th Cir.1994). In evaluating the evidence underlying a conspiracy conviction, we are not limited to direct evidence; circumstantial evidence will do. *Id.*

■ " 'A criminal conspiracy is an agreement to commit a crime.' " *Zarnes,* at 1465 (quoting *United States v. Lechuga,* 994 F.2d 346, 348 (7th Cir.) (en banc), *cert. denied,* —— U.S. ——, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993)). "To obtain a criminal conviction for conspiracy under § 846, the government must establish the existence of an agreement between two or more individuals, with the intent to commit an offense in violation of the Controlled Substance Act." *United States v. Sanders,* 32 F.3d 299, 302 (7th Cir.1994). Once the existence of a conspiracy has been established, the government may connect a defendant to the conspiracy if there is substantial evidence that the defendant both knew of the conspiratorial agreement and intended to join its criminal purpose. *See Zarnes,* 33 F.3d at 1465.

To be sure, "[a] buyer-seller relationship, standing alone, does not establish the existence of a conspiracy." *Zarnes,* 33 F.3d at 1465. What is necessary is " 'proof of an agreement to commit a crime other than the crime that consists of the sale itself.' " *Id.* (quoting *Lechuga,* 994 F.2d at 347). This means that "there must be facts in evidence in addition to a sale for resale from which proof of a conspiracy to distribute can be inferred." *United States v. Baker,* 1 F.3d 596, 597 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 412, 126 L.Ed.2d 359 (1993). This evidence can include transactions involving large quantities of drugs, prolonged cooperation between the parties, and sales on a credit, or "front," basis. *See Zarnes,* 33 F.3d at 1465.

■ Several of these factors are clear from the record. Karin Cutkomp testified, for example, that Sax came to her home in Illinois to solicit her husband's help in distributing Sax's marijuana into the Quad Cities. Cutkomp agreed to do so. This alone shows that the parties contemplated more than a mere buy-sell arrangement. But

there is more. Sax soon began sending Cutkomp shipments of marijuana weighing well over 100 pounds. At one point in the conspiracy, Cutkomp was receiving two such shipments per month. Sax also made similar large shipments to Joe Cullinane. In arranging for these large-scale shipments, Sax, Cutkomp and Cullinane had worked out a standardized method of delivery; Sax would arrange for his own drivers to deliver hundreds of pounds of marijuana by truck, one portion to be dropped off with Cutkomp and his distribution minions, the rest to go on to Chicago to be delivered to Cullinane. This too is evidence pointing beyond a buy-sell arrangement. *See, e.g., Zarnes,* 33 F.3d at 1465 (stating that evidence to show agreement to commit a crime other than the sale itself can include "transactions in which the parties have standardized their dealing with one another."). Sax conducted business in this manner with Cutkomp and Cullinane for over two years. There is more, but from this alone the jury could reasonably conclude that Sax, Cutkomp and Cullinane were involved in a full-blown conspiracy to distribute marijuana. We reject Sax's contentions to the contrary.[4]

## B. Withdrawal From the Conspiracy

Sax's main defense at trial was that he had withdrawn from the conspiracy more than five years before the original indictment was filed. He correctly observes that according to 18 U.S.C. § 3282, a prosecution for conspiracy is governed by a five-year statute of limitations. This means that the government in a criminal conspiracy prosecution must demonstrate that a conspiracy existed and that "the defendant was a member of the conspiracy at some point in the five years preceding the indictment." *United States v. Read,* 658 F.2d 1225, 1232 (7th Cir.1981). The original indictment was issued in this case on May 7, 1992. Therefore, the government was required to prove that Sax was still

a member of the conspiracy after May 7, 1987. Sax vigorously maintains that he was not. He claims that he had withdrawn from the conspiracy no later than late 1986, when Cutkomp and Cullinane ceased purchasing marijuana from Sax's successor-in-interest, Ted Eichorn. This, coupled with the government's failure to put on any evidence that Sax committed any acts in furtherance of the conspiracy within the five-year period preceding the government's original indictment of May 7, 1992, forms the basis for Sax's claim that this prosecution was barred by the statute of limitations.

■ First, some general principles. Withdrawal from a conspiracy is easier to state than achieve. Withdrawal requires an affirmative act on the part of the conspirator; he must either make a full confession to the authorities, or communicate to each of his coconspirators that he has abandoned the conspiracy and its goals. *See United States v. DePriest,* 6 F.3d 1201, 1206 (7th Cir.1993); *accord United States v. Patel,* 879 F.2d 292, 294 (7th Cir.1989), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 494 (1990). " 'Merely ceasing participation in the conspiracy, *even for extended periods of time,* is not enough' to evidence withdrawal." *DePriest,* 6 F.3d at 1206 (quoting *United States v. Bafia,* 949 F.2d 1465, 1477 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1989, 118 L.Ed.2d 586 (1992)) (emphasis added). Instead, the conspirator must take affirmative steps to *defeat* or *disavow* the conspiracy's purpose. *See Read,* 658 F.2d at 1234. Until he does, he is presumed to continue in the conspiracy. *See DePriest,* 6 F.3d at 1206; *Read,* 658 F.2d at 1234.

At the close of the evidence, the district court heard arguments by both parties regarding Sax's Rule 29(b) motion for acquittal, in which he claimed, among other things, that he had withdrawn from the conspiracy more than five years before the filing of the origi-

---

**4.** Sax makes a passing challenge to the district court's conspiracy instruction. He complains that the instruction told the jury that it had to find that Sax had committed an overt act in furtherance of the conspiracy, even though there is no overt act requirement under 21 U.S.C. § 846. *See United States v. Sassi,* 966 F.2d 283, 285 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992). But the fact

that the government has imposed an additional burden upon itself is not grounds for reversal. *See United States v. Jackson,* 935 F.2d 832, 842 (7th Cir.1991). Moreover, as we shall see later on in the opinion, charging Sax with acts in furtherance of this conspiracy put him on notice that the government could invoke the *Pinkerton* doctrine in seeking to establish Sax's guilt on the other counts charged in the indictment.

nal indictment. Following argument on Sax's motion, and after denying Sax's motion for acquittal on the two counts of money laundering, the district court issued the following ruling:

> The conspiracy charge is much easier for the Court, it didn't have any difficulty denying those motions for acquittal. I think there were acts, money laundering acts, of Mr. Sax subsequent to May 7, 1987. I think there's a question of whether or not his withdrawal was complete and in good faith. There was [sic] certain people he didn't tell. You certainly would expect him to have told Cullinane or O'Donnell. You would certainly think that the money laundering activities were inconsistent with his withdrawal. *If the defendant is withdrawing from drug transactions, seems to me I sure as hell wouldn't be taking money or facilitating money from drug dealers. That's inconsistent with a claim that he's withdrawing,* and other contacts that—and connections and events that the defendant Sax had with drug dealers subsequent to the claimed withdrawal, so the Court would deny the motion to acquit on the conspiracy charge, also.

(Emphasis added.)

■ We agree. To accept Sax's argument that he had withdrawn from this conspiracy at the moment he sold his business to Eichorn would turn the doctrine of withdrawal on its head. Sax's sale can hardly be characterized as " *'some act to disavow or defeat the purpose* [of the conspiracy].' " *Read,* 658 F.2d at 1234 (quoting *Hyde v. United States,* 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912)) (emphasis in original). On the contrary, the evidence demonstrates that Sax continued to wholeheartedly endorse the purpose of the marijuana conspiracy—making profits from drug sales—by passing it along to Eichorn. Payment to Sax for the business was contingent on future drug sales. What is more, even before Sax sold his interest to Eichorn, he had been busy setting up legitimate investment opportunities for his fellow coconspirators through which they could clean up their drug monies. And, following the sale of his business, Sax stepped up his role as financial manager, knowing full well that the money he was receiving was the proceeds of drug sales. This was of great benefit to them, *cf. United States v. Tarantino,* 846 F.2d 1384, 1396–97 (D.C.Cir.1987), *cert. denied,* 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988) ("money launderers play an essential part in a [§ 846] conspiracy") and, as a general partner in the several limited partnerships which received these investments, it was also another way for Sax to continue enjoying the fruits of the ongoing conspiracy. In other words, Sax simply sold the marketing and distribution end of the business, and then redirected his efforts towards the investment side of the conspiracy. As we have previously stated, "the law will not let you wash your hands of a dangerous scheme *you have set in motion and that can continue to operate and cause great harm without your continued participation." Patel,* 879 F.2d at 294 (emphasis added). Where the defendant merely changes roles in the very same conspiracy that he himself had previously set in motion, his hands remain soiled. The district court and, later, the jury, were quite correct in concluding that there was ample evidence showing that Sax had not disavowed or renounced the purpose of the marijuana conspiracy, which means that the government's prosecution was not barred by the statute of limitations.

■ Sax also contends that the district court's withdrawal instruction is flawed because it does not clearly tell the jury that they must acquit the defendant if they had reasonable doubts concerning his continued membership in the conspiracy. The transcript of the instructions conference reveals that Sax's counsel raised no such objection, which means that we review his challenge for plain error. *See United States v. McKenzie,* 922 F.2d 1323, 1330 n. 4 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 163, 116 L.Ed.2d 127 (1991). There is no plain error. The instruction told the jury that

> Merely ceasing participation in the conspiracy standing alone even for extended periods is not withdrawal.
> In order to withdraw, Marty Sax must have taken some affirmative act to terminate his effort to promote or facilitate the conspiracy by doing an affirmative act inconsistent with the object of the conspiracy where such act is communicated in a manner reasonably calculated to reach coconspirators.

Marty Sax cannot be found guilty of the conspiracy charge if he withdrew from the conspiracy more than five years before the indictment was returned. In other words, he had to withdraw before any act committed within the statute of limitations period. Acts not alleged in the indictment may be proved to show his participation in the conspiracy within the statute of limitations. The indictment in this case was returned on May 7, 1992. Thus, the government must prove beyond a reasonable doubt that Marty Sax did not withdraw from the conspiracy prior to May 7, 1987.

This instruction comports with the law of this circuit. It made it clear to the jury that Sax bore the burden of going forward with evidence of withdrawal. It also informed them that once Sax goes forward with such evidence, the government bears the burden of disproving Sax's withdrawal beyond a reasonable doubt. That is all our precedent requires. *See Read,* 658 F.2d at 1236.

### C. Money Laundering Under 18 U.S.C. § 1956(a)(1)(B)(9)

Sax raises a host of issues and subissues related to this aspect of his conviction, but we consider only those aimed at the jury instructions. In evaluating Sax's claims, we will "review the instructions as a whole, and '[a]s long as the instructions treat the issues fairly and adequately, they will not be interfered with on appeal.'" *United States v. Ruiz,* 932 F.2d 1174, 1179 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 151, 116 L.Ed.2d 116 (1991) (quoting *United States v. McNeese,* 901 F.2d 585, 607 (7th Cir.1990)).

At the instructions conference, Sax's attorney directed most of his efforts against the government's aiding and abetting instruction given by the court: "Any person who knowingly aids, abets, counsels, commands, induces or procures the commission of a crime is guilty of that crime. However, that person must knowingly associate himself with the criminal venture, participate in it, and try to make it succeed." In support of this instruction the government argued that Sax had knowingly aided Cutkomp, as well as Eichorn (acting through Wainwright), in investing their drug proceeds into CNA I, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). This, according to the government, made him punishable as a principal under 18 U.S.C. § 2(a); hence the instruction. In response, Sax argued that there was no evidence of record that could justify the instruction as a basis for liability under counts three and four of the superseding indictment. Count three relates to Cutkomp's annual deposit of $4,125 into CNA I on February 12, 1988. Abrams testified that he probably received that payment by mail, as he had no recollection that it had been delivered to him by Sax. Count four relates to an annual payment into CNA I that Wainwright, acting for Eichorn, personally made to Abrams in March of 1988. Sax's attorney argued to the district court that since Sax was not in any way personally connected to either of these CNA I payments, the evidence did not support the government's aiding and abetting instruction. The district court took Sax's objections under advisement and promised a ruling the following day.

■ The next day, before resuming discussion on the disputed instruction, the district court heard argument on Sax's pending Rule 29(b) motion for acquittal. In responding to this motion, particularly those portions seeking acquittal of the money laundering counts, the government argued that Sax could be held liable for both counts of money laundering under the doctrine of coconspirator liability set forth in *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Under the *Pinkerton* theory, a defendant who is involved in a criminal conspiracy can be held liable for the criminal acts of his coconspirators if such acts are in furtherance of or are a natural consequence of the conspiracy. *See United States v. Manzella,* 791 F.2d 1263, 1267 (7th Cir.1986). Sax objected, claiming that he had not been notified that the government would rely on *Pinkerton* as a basis for establishing Sax's liability for money laundering. The district court, without commenting on the government's *Pinkerton* argument, denied Sax's motion for acquittal, and resumed its instruction conference. The district court gave the jury both an aiding and abetting instruction, as well as a pattern *Pinkerton* instruction.[5] The jury found Sax guilty.

---

**5.** The district court gave the following *Pinkerton*     instruction:

Sax renews his challenge to the district court's aiding and abetting and *Pinkerton* instructions. However, we will address only the latter. This is because, given the open and shut case against Sax regarding his continued involvement in this conspiracy, if a *Pinkerton* instruction was appropriate, then this eliminates the need to address the majority of his other challenges to his money laundering convictions.[6]

█ Sax's main complaint against this instruction, raised both below in his post-trial motion for acquittal under Rule 29(c) and in this court, is that it was given at all. Specifically, he claims that the government, by not invoking *Pinkerton* until the instruction stage, has engaged in unfair "bait and switch." In essence, Sax claims that he was unfairly surprised by the government's decision to invoke *Pinkerton* as an alternative basis for establishing criminal liability under counts three and four of the indictment.[7] In ruling on Sax's Rule 29(c) motion, the district

court had this to say about Sax's claim of "surprise":

The Pinkerton instruction was consistent with a viable theory of the government's case.... The government asked for a Pinkerton instruction only after the Court balked at the giving of an aiding and abetting instruction, and the Defendant had the opportunity to argue the issue. The underlying premise of the Pinkerton instruction is inherent in an Indictment alleging a conspiracy since it is horn book law that a co-conspirator is liable for overt acts committed by other members in furtherance of the conspiracy. Experienced trial counsel for Defendant was surely on notice as to this prospect; the surprise comes from the government's request for it during the conference on instruction. I see no reason why the government should be required to give Defendant advance notice of its trial strategy in this regard or be precluded from seeking an instruction consistent with the applicable law of conspira-

---

A conspirator is responsible for offenses committed by his fellow conspirator if he was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of or as a natural consequence of the conspiracy.

Therefore, if you find a defendant guilty of the conspiracy as charged in Count 1 and if you find beyond a reasonable doubt that while he was a member of the conspiracy, his fellow conspirators committed the offenses in Counts 3 and 4 in furtherance of or as a natural consequence of that conspiracy, then you should find him guilty of Counts 3 and 4. This instruction is identical to this Circuit's *Pinkerton* instruction. *See McKenzie,* 922 F.2d at 1330 n. 3.

**6.** Sax also suggested, both in his Rule 29(c) motion and in his brief to this court, that the government failed to prove that any of the coconspirators' investments into the various limited partnerships were punishable as money laundering under 18 U.S.C. § 1956(a)(1)(B)(i). Sax claims that to obtain a conviction under this section, the government was required to prove that the defendant intended to, and did, conceal the identity of the source of the ill-gotten gain used in the particular financial transaction. Sax maintains that Abrams knew all along that Mike Cutkomp and Ted Eichorn were investing their monies into CNA I. This shows that there was no attempt to conceal the identities of the persons making the investments, which, according to Sax, demonstrates that none of the transactions listed in counts three and four of the indict-

ment constituted money laundering under § 1956(a)(1)(B)(i). But to accept such a deformed reading would vacate the statute. A plain reading of the provision referred to by Sax, subsection (B)(i), reveals that the element of concealing or disguising applies to "the nature, the location, the source, the ownership, *or* the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i) (emphasis added). Those things which can be concealed are listed in the disjunctive, which means that the " 'money laundering statute is not aimed solely at commercial transactions intended to disguise the relationship of the item purchased with the person providing the proceeds; the statute is aimed broadly at transactions designed in whole or part to conceal or disguise in any manner the nature, source, ownership or control of the proceeds of unlawful activity.' " *Hollenback v. United States,* 987 F.2d 1272, 1278–79 (7th Cir.1993) (quoting *United States v. Lovett,* 964 F.2d 1029, 1034 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 169, 121 L.Ed.2d 117 (1992)).

**7.** Sax also offers a series of trifling contentions regarding the wording of the district court's *Pinkerton* instruction. None of these, however, were raised below, which means that in order for any of these alleged shortcomings to rise the level of reversible error, the error must be "plain." *See Ruiz,* 932 F.2d at 1181; *McKenzie,* 922 F.2d at 1330 n. 4. We are satisfied that nothing in the wording of the district court's *Pinkerton* instruction constituted error, plain or otherwise.

cy. Defendant is presumed to know the law.

This ruling is sound. *United States v. Galiffa*, 734 F.2d 306, 314 (7th Cir.1984), makes it clear that the government does not have to fire a warning shot by including in the indictment every theory of law that it will employ in its attempt to convict the defendant. Indeed, "[w]hen one is charged with conspiracy, it is probable that he will also be charged with the substantive offenses committed by a co-conspirator because one who is found to be a part of the conspiracy may be liable for the substantive crimes springing from the conspiracy." *Galiffa*, 734 F.2d at 315. This is especially true where, as here, the indictment put Sax on clear notice of potential *Pinkerton* liability by alleging that Sax's coconspirators committed various acts of money laundering as part of and in furtherance of the conspiracy. Moreover, nowhere in his meandering brief does Sax bother to point out any prejudice resulting from the government's failure to tip its hand. In short, Sax cannot demonstrate that the district court committed reversible error in giving this instruction.

## D. Venue

Sax's final argument is that there was no evidence placing venue for the money laundering offenses in the Central District of Illinois. "Venue is proper in any district where an 'offense was begun, continued, or completed.'" *United States v. Molt*, 772 F.2d 366, 369 (7th Cir.1985), *cert. denied*, 475 U.S. 1081, 106 S.Ct. 1458, 89 L.Ed.2d 715 (1986) (quoting 18 U.S.C. § 3237(a)). Moreover, "proof of venue 'is not an essential fact constituting the offense charged … and need only be proved by a preponderance of the evidence.'" *United States v. Hatchett*, 31 F.3d 1411, 1424 (1994) (quoting *United States v. McDonough*, 603 F.2d 19, 22 (7th Cir.1979)); *accord United States v. Canino*, 949 F.2d 928, 942 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992). This "may include inferences drawn from circumstantial evidence." *Canino*, 949 F.2d at 942.

■ The government met its burden in this case. "Under section 3237(a) venue is proper in any district where any part of the money laundering scheme occurred." *Unit-ed States v. Beddow*, 957 F.2d 1330, 1336 (6th Cir.1992). Evidence shows that the funds used for the acts of money laundering alleged in count three of the indictment were the proceeds of Cutkomp's drug sales in the Central District of Illinois. This is sufficient to confer proper venue under § 3237(a). *See id.*

■ We reach the same conclusion as to venue for count four; but a few more facts are needed. The funds used in this transaction came from $50,000 in cash that Eichorn, sometime in late 1987, gave to Wainwright in Arizona with instructions to invest it in Wainwright's Illinois farming business. Wainwright invested approximately half of this as instructed; the remainder he used to pay bills and buy groceries while living in Illinois. In March of 1988 Wainwright's and Eichorn's annual payment into CNA I came due. So Wainwright gathered up whatever was left of Eichorn's money and headed to Tucson, whereupon on March 21, 1988 he made a cash payment of $4,125 to Abrams, stating that this was Eichorn's annual payment into CNA I. Returning to the issue of venue, it is true that Eichorn gave this money to Wainwright while they were both living in Arizona. But that poses no obstacle to establishing venue in the Central District of Illinois, for these funds came from the drug sales of John Heller, whom Wainwright and Eichorn, as alluded to earlier in the opinion, had recruited in late 1986 to sell Eichorn's marijuana in Illinois. Wainwright testified that he continued to make kickbacks off of Heller's sales up through mid–1988. And we think it more likely than not that Heller was making these drug sales in the Central District of Illinois. Wainwright testified that he grew up in the Quad Cities area of Illinois, which is in the Central District. When asked how he knew Heller, Wainwright stated that "[h]e was a friend of mine from back here in the Midwest." We take "here" to mean the Quad Cities area or, even the Peoria, Illinois area, where Sax's trial was being conducted. And so when Wainwright testified that Heller would take Eichorn's marijuana and sell it back in the Midwest, we think it more likely than not that Heller was bringing it back to sell either in the Quad Cities or Peoria, which means that it was being sold in

the Central District of Illinois. As stated earlier, this is enough to place venue in the Central District of Illinois. Therefore, we conclude that the government demonstrated, under the preponderance standard, that venue for both money laundering offenses was proper in the Central District of Illinois.[8]

Sax also raises a challenge to the district court's venue instruction. The district court instructed the jury on venue as follows:

> The law requires that a defendant may be prosecuted only in the judicial district in which the offense charged was committed. In the case of a charge of an offense committed in more than one district, a defendant may be prosecuted in any judicial district in which the offense was begun, continued, or completed.

> Therefore, you must find by a preponderance of the evidence with respect to each of Counts 1, 3 and 4 of the indictment that the offense charged was begun, continued, or completed in the Central District of Illinois.

Because the instruction does not mention Sax by name, Sax claims that the jury was not given any guidance on how to relate venue to Sax's own conduct. This, Sax reasons, was tantamount to not instructing the jury on an essential element of the money laundering offenses for which he was convicted.

Sax, however, did not raise any objection to this instruction below, which means that we would normally review his claim under the plain error standard. *See Ruiz*, 932 F.2d at 1182; *McKenzie*, 922 F.2d at 1330 n. 4. But it makes no difference whether we review for "plain error," or an "abuse of discretion," for Sax's ultimate contention—that the jury was not instructed as to Sax—is flawed. The jury was obviously aware that Sax was the "defendant" being prosecuted for the offenses in counts three and four, the venue of which needed to be established in the Central District of Illinois. Moreover, as stated earlier, "proof of venue is not an essential fact constituting the offense charged." *Hatchett*, 31 F.3d at 1424. There is no error in this instruction.

---

**8.** In addition, the fact that Sax could be held liable under *Pinkerton* for the acts of his coconspirators, coupled with the fact that both of the acts "in furtherance of" the conspiracy (money

### E. *Sentencing*

In its cross-appeal, the government takes issue with the district court's refusal to apply two Guidelines enhancements to Sax's base offense level. The government first contends that the district court committed clear error when it made a factual determination that Sax was an organizer or leader of the marijuana conspiracy, yet chose not to enhance Sax's offense level by four levels pursuant to U.S.S.G. § 3B1.1(a). As its next claim of error, the government claims that the district court incorrectly determined that Sax's act of laundering Cutkomp's cash into CNA I did not constitute concealment of evidence material to the instant offense for which Sax was ultimately convicted and, therefore, did not constitute the obstruction of justice under U.S.S.G. § 3C1.1.

Before setting out our standard of review, we are compelled to address some disturbing allegations asserted by the government in this portion of its brief. In one portion of its brief, the government characterized the district court's refusal to grant an enhancement as an act of manipulation designed to achieve a result; elsewhere, the government asserted that there was no question that the district judge had "played fast and loose with the guidelines." The government even went so far in making its case against the district court that it quotes from portions of a subsequent sentencing hearing of one of Sax's codefendants, Mr. Jeff Curtis, in which the same district judge (according to a portion quoted in the government's brief but not included therein as required by our Circuit Rule 30, thus making verification impossible) supposedly acknowledged a tendency that judges have "to play fast and loose with the guidelines in order to reach a result." This, according to the government, is conclusive proof that the district court did just that in sentencing Sax. At oral argument we took issue with these characterizations of the district judge's actions. We pointed out that the government, in making these assertions, was essentially accusing the district judge of misconduct. The AUSA assigned to this ap-

laundering) were committed in the Central District of Illinois, provides an alternative basis why venue was proper there. *See Molt*, 772 F.2d at 369.

peal assured us that it was not the government's intention to assert that the district judge in this case did not obey the law; he then went on to say that the district judge in this case refused to apply—disobeyed—the law. Perhaps the AUSA assigned to this appeal, in an attempt to vigorously make the government's case, simply employed language and phraseologies the connotations of which he had not fully contemplated. This may well be the case, for after further inquiry, we learned that the Solicitor General apparently had not had an opportunity to screen this particular brief. We suggest that, in order to avoid future unintended accusations against members of the bench, this particular United States Attorney's office take whatever steps necessary to comply with 18 U.S.C. § 3742(b), such as submitting its work product to the Solicitor General or one of his deputy solicitors for screening before seeking a review of a district judge's sentence.

Having said this, we now turn to the government's cross-appeal, bearing in mind that the district court's sentence under the Guidelines "will be upheld so long as the Guidelines were correctly applied to findings of fact that were not clearly erroneous." *United States v. Brown,* 944 F.2d 1377, 1379 (7th Cir.1991).

Section 3B1.1(a) provides for a four-level increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Factors a district court may consider in determining whether to apply the enhancement include " 'the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, ... the degree of participation in planning or organizing the offense, the nature and scope of the illegality, ... and the degree of control and authority exercised over others.' " *United States v. Carson,* 9 F.3d 576, 584 (7th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 135, 130 L.Ed.2d 77 (1994) (quoting Application Note 3). This control need not be direct, however; "[e]fforts to marshall other individuals for the purpose of executing the crime" are enough to demonstrate sufficient control over a par-

ticipant for purposes of § 3B1.1(a). *Id.* at 585.

■ At sentencing, the district court made the following statements in conjunction with determining that Sax was not an organizer or leader under § 3B1.1(a), which we reprint in full:

I agree to a certain extent ... that sometimes it's difficult to pigeonhole exactly where a person fits in terms of role in the offense. It seems to me that Mr. Sax certainly was a leader and organizer when he went out and solicited associates in the drug business to invest their money in those investments he had. He certainly was an organizer or leader in that sense.

He certainly didn't control or organize Mike Cutkomp and his drug dealing. He didn't have control over who he sold to here in Rock Island. To that sense he might not have been an organizer and a leader, although there is some evidence he recruited Cutkomp, but there's also some suggestion in the record that, well, I guess, Cutkomp's statement that he wasn't solicited by Sax, then there is the information, there's the testimony that apparently when Cutkomp had a problem with O'Donnell ... or other drivers he will call Mr. Sax, presumably because Mr. Sax had some role there whereby he was calling the shots or at least in the position to solve the distribution problems, the organization problems. So I certainly think there is a basis to find that the defendant was an organizer or a leader of a criminal activity that involved five or more participants or was otherwise extensive, which according to the application notes is [sic] Section 3B1.1 covers the situation where a person may not even know everybody who is involved but they have to know that a lot of other people are involved and being used to carry out the objectives.

*So even though the Court feels that there is sufficient adequate basis in the record here to find that the defendant was an organizer and leader and subject to the four level adjustment, the Court will find in a cautious mode that the defendant was a manager or supervisor, and as such his role in the offense would require a three*

level increase, under 3B1.1(b) rather than a four level increase under 3B1.1(a).

*But I want the record to clearly state the Court's judgment that the Court could very easily and the Court provides for a four level increase because I do find there's a sufficient basis in the record to find that the defendant was an organizer or a leader, particularly with reference to the money laundering counts, but I chose not to do this for cautious reasons.*

So, therefore, with reference to Objections 4 and 23 by defendant, the Court would adopt the defendant's position. Well, I take that back. The Court adopts neither the probation officer's position nor the defendant's position completely but finds that the defendant is subject to a three level enhancement for his role in the offense as a manager or supervisor.

(Emphasis added.)

■ Contrary to the government's assertions, we do not interpret any of these statements to be a definitive finding that Sax controlled the requisite number of participants to qualify him as an organizer or leader under § 3B1.1(a). Rather, given the conversational tone of this transcript, we think it more appropriate to characterize these statements as a careful weighing of two competing views of the evidence. That is, after wrestling with this issue, and acknowledging that there might be a sufficient evidentiary basis to support a finding that Sax was an organizer or leader within the meaning of § 3B1.1(a), the district court finally chose to come down on the side of Sax and found that, in its view of the evidence, such a determination was inappropriate. This choice between two permissible views of the evidence "cannot be clearly erroneous." *United States v. Ramos,* 932 F.2d 611, 619 (7th Cir.1991) (citing *Anderson v. City of Bessemer City,* 470 U.S. 564, 567, 105 S.Ct. 1504, 1508–09, 84 L.Ed.2d 518 (1985)). At this point it was incumbent upon the government, as the party seeking to overturn the district court's determination, to direct us to something in the record that would leave us with a "firm conviction that a mistake has been made." *Ramos,* 932 F.2d at 619 (quotations omitted) (citations omitted). It has not done so. Therefore, we will not disturb the district

court's "cautious" determination that Sax was not an organizer or leader under § 3B1.1(a).

We come finally to the government's claim that the district court erred in refusing to increase Sax's base offense level by two levels for obstruction of justice under § 3C1.1. Section 3C1.1 provides for a two-level increase "[i]f the defendant willfully obstructed ·or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense.…" U.S.S.G. § 3C1.1. Note 3(d) of the Commentary to this section provides that "concealing … evidence that is material to an official investigation … or attempting to do so" is an example of conduct to which the enhancement applies. Application Note 3(d).

■ At the sentencing hearing, the government argued that the events surrounding Sax's receipt and deposit of Cutkomp's February 1989 annual payment into CNA I demonstrated an attempt on the part of Sax to impede the investigation of his own offense of conspiracy. In February of 1989, Sax acquired Cutkomp's cash through Rick Snider, knowing at the time that Cutkomp was the target of a criminal investigation. Sax took this cash (which was proceeds of Cutkomp's marijuana sales) and personally delivered it to Abrams on February 17, 1989, stating that it was Cutkomp's annual payment to CNA I. · Two months later, after denying to the authorities that he had received drug money from Cutkomp and others, Sax went over to Abrams' home to inform him that Cutkomp was in trouble with the authorities. At that point Sax and Abrams learned that Cheryl Abrams had never deposited Cutkomp's cash payment into CNA I; Sax directed that Cutkomp's cash be deposited as usual. These events, the government claimed, demonstrated that Sax had attempted to conceal evidence material to the investigation of his own conspiracy conviction, which, in turn, demonstrated that Sax had obstructed justice within the meaning of § 3C1.1. The district court denied this enhancement, and adopted the view of the probation officer that Sax's conduct did not obstruct the investigation of the offense for which he was convicted. This was clearly erroneous. Cutkomp's cash was the proceeds of his marijuana sales which

flowed from the conspiracy in which Sax was still a member. Thus, this cash was evidence relevant to establishing the charge of conspiracy to distribute marijuana for which Sax was convicted. *See Brown,* 944 F.2d at 1383. That being the case, Sax's statement to the investigating authorities denying any knowledge of Cutkomp's drug activities, as well as his subsequent laundering of Cutkomp's drug monies, fell squarely within the definition of obstructing justice under § 3C1.1. But contrary to the government's assertions, this was not due to a conscious disregard of the evidence or the Guidelines; rather, we view this as simply an incorrect interpretation of what constituted the "instant offense" to which this enhancement was being applied. For that reason, we vacate this portion of the district court's sentence and remand for resentencing.

### III.

For the foregoing reasons, Sax's convictions for conspiracy under 21 U.S.C. § 846 and money laundering under 18 U.S.C. § 1956(a)(1)(B)(i) are AFFIRMED. We VACATE that portion of Sax's sentence regarding the issue of the two-level enhancement for obstruction of justice under § 3C1.1, and REMAND for resentencing consistent with this opinion.